The YANKTON SIOUX TRIBE, a Federally Recognized Tribe of Indians, and its Individual Members, and Darrell E. Drapeau, Individually, a Member of the Yankton Sioux Tribe, Plaintiffs,

v.

SOUTHERN MISSOURI WASTE MANAGEMENT DISTRICT, a Non-profit Corporation, Defendant.

SOUTHERN MISSOURI WASTE MANAGEMENT DISTRICT, Third–Party Plaintiff,

v.

STATE OF SOUTH DAKOTA, Third–Party Defendant.

No. CIV 94–4217.

United States District Court, D. South Dakota, Southern Division.

June 14, 1995.

James G. Abourezk, Robin L. Zephier, Abourezk Law Offices, Rapid City, SD, for plaintiff.

Kenneth W. Cotton, Wipf & Cotton, Wagner, SD, for defendant and third-party plaintiff.

Roxanne Giedd, John P. Guhin, Charles D. McGuigan, Atty. Gen. Office, Pierre, SD, for third-party defendant.

## MEMORANDUM OPINION AND ORDER

PIERSOL, District Judge.

The central issue in this case is whether the Yankton Sioux Reservation, created by the 1858 Treaty between the United States and the Yankton Sioux Tribe, was disestablished and returned to the public domain on August 15, 1894, when the Fifty–Third Congress ratified a December 31, 1892 Agreement with the Yankton Sioux for the sale of surplus lands. The Court holds that the 1894 Act did not disestablish the exterior boundaries of the Yankton Sioux Reservation. The Court also holds, however, that the Yankton Sioux Tribe failed to establish that it may exercise regulatory jurisdiction over the municipal solid waste landfill proposed to be built by Southern Missouri Recy-

cling and Waste Management District on non-Indian land located within the exterior boundaries of the reservation. Finally, the Court holds that federal EPA regulations apply to Southern Missouri's proposed facility, that Southern Missouri will be required to install a composite liner as defined in the federal regulations, and Southern Missouri may proceed to construct the facility with the composite liner at the site selected.

## I. Preservation of the Reservation

■ "[O]nly Congress can divest a reservation of its land and diminish its boundaries." *Solem v. Bartlett,* 465 U.S. 463, 470, 104 S.Ct. 1161, 1166, 79 L.Ed.2d 443 (1984). In determining whether a reservation has been diminished or disestablished, this Court must apply the analytical structure set out in the Supreme Court precedents, looking primarily to three factors. *See Hagen v. Utah,* — U.S. —, —, 114 S.Ct. 958, 965, 127 L.Ed.2d 252 (1994); *Solem,* 465 U.S. at 470, 104 S.Ct. at 1166. The equities of the situation cannot, under established precedent, be given any consideration in determining the outcome from this analysis. The most probative evidence is the language used to open the Indian lands to settlement. *Hagen,* — U.S. at —, 114 S.Ct. at 965. "Explicit reference to cession or other language evidencing the present and total surrender of all tribal interests strongly suggests that Congress meant to divest from the reservation all unallotted opened lands." *Solem,* 465 U.S. at 470, 104 S.Ct. at 1166; *DeCoteau v. District County Court,* 420 U.S. 425, 444–45, 95 S.Ct. 1082, 1092–93, 43 L.Ed.2d 300 (1975). "[A] statutory expression of congressional intent to diminish, coupled with the provision of a sum certain payment, would establish a nearly conclusive presumption that the reservation had been diminished." *Hagen,* — U.S. at — - —, 114 S.Ct. at 965–66. Secondly, the Court must consider the historical context surrounding the passage of the surplus land Act, looking more carefully to the evidence of the contemporaneous understanding of the Act rather than to matters occurring after passage of the Act. *Id.* Finally, the Court may explore whether diminishment occurred *de facto,* by considering whether the opened area was settled by non-Indians and has now lost its Indian character. *Id.; Solem,* 465 U.S. at 471, 104 S.Ct. at 1166. The Court will not lightly find diminishment or disestablishment, and the Court must resolve any ambiguities in favor of the Indians. *Hagen,* — U.S. at —, 114 S.Ct. at 965. Before considering the language of the 1892 Agreement, the Court will reconstruct the events that preceded negotiation of the 1892 Agreement and consider the historical context of the 1894 ratification of the Agreement.

The evidence presented at trial shows that, in the April 19, 1858 Treaty, 11 Stat. 743, (Pl.Ex. 1), the Yankton Sioux ceded and relinquished to the United States:

> all the lands now owned, possessed, or claimed by them, wherever situated, except four hundred thousand acres thereof, situated and described as follows, to wit— Beginning at the mouth of the Naw-izi-wa-koo-pah or Chouteau River and extending up the Missouri River thirty miles; thence due north to a point; thence easterly to a point on the said Chouteau River; thence down said river to the place of beginning, so as to include the said quantity of four hundred thousand acres.

The Yankton Sioux were to have exclusive occupation of the reservation lands, along with unrestricted use of the red pipestone quarry in the State of Minnesota. A land survey later conducted revealed that 430,495 acres were included in the area described by the 1858 Treaty and reserved to the Yankton Sioux. S.Exec.Doc. No. 27, 53rd Cong., 2d Sess., at 5 (1894). (Pl.Ex. 5.) The land mass comprising the 1858 Yankton Sioux Reservation is located in the central to southeastern portion of Charles Mix County, South Dakota.

In the 1858 Treaty, the Yankton Sioux relinquished and abandoned all claims and complaints growing out of any and all treaties previously made by them or other Indian Tribes, except for their claim to annuity rights under the September 17, 1851 Treaty of Laramie. In return for the cession of land and release of claims, the United States agreed to protect the Yankton Sioux in their "quiet and peaceable possession" of the tract reserved to them. The government also

agreed to pay the Yankton Sioux or to expend for their benefit, starting the year of their settlement upon the reservation, the total sum of $1.6 million in annuities over a period of fifty years. The government also agreed to expend additional amounts during the first year of the Tribe's relocation for the purchase of stock, agricultural implements, and fencing, and for the construction of houses, schools, and other buildings.

In the years that followed, the federal government did not provide all of the financial assistance promised. To compound this problem, the northern plains region experienced extreme weather cycles of prolonged drought and devastating flood, leaving the Yankton Sioux desperate for cash and direct assistance. The Yankton Sioux generally did not want to become involved in the Great Sioux War, and the Tribe suffered inner turmoil during this period. Some members of the Yankton Sioux Tribe served as scouts for federal troops. The growing population of white farmers, businessmen, and railroad men began pressuring federal government officials to open the surplus lands of the Yankton Sioux Reservation for settlement.

By passage of the General Allotment Act on February 8, 1887 (Dawes Act), 24 Stat. 388, Congress attempted to reconcile the federal government's responsibility for the Indians' welfare with the desire of non-Indians to settle upon tribal lands. Congress determined that tracts of reservation land should be allotted to individual tribal members and, with the Tribe's consent, the surplus lands should be sold to white settlers, with the proceeds of these sales dedicated to the benefit of the Indians. This new policy of Congress sought to encourage the Indians to adopt the ways of the white settlers and thereby become socialized into the white culture. Faced with all of these pressures, the Yankton Sioux split into three factions: those who wished to accommodate by selling the surplus lands, those who were ambivalent about any such sale, and those who strongly opposed the sale of surplus lands.

Of the 430,495 acres of land comprising the 1858 Yankton Sioux Reservation, 167,325 acres were allotted and patented to the Indians under the Dawes Act. By early 1894, allotments under the Act of February 28, 1891, 26 Stat. 594, had been made in the field, but those allotments had not been examined and approved. The federal government estimated that some 95,000 additional acres had been allotted after passage of the 1891 Act, leaving surplus lands of approximately 168,000 acres. S.Exec.Doc. No. 27, 53rd Cong., 2d Sess., at 5 (1894); (Pl.Ex. 5.)

In 1892 the Secretary of the Department of the Interior appointed three members to serve on the Yankton Indian Commission to negotiate the sale of the surplus land owned by the Yankton Sioux. (Pl.Ex. 28.) These three commissioners were John J. Cole, J.C. Adams, and Dr. W.L. Brown; however, Dr. Brown resigned from the Commission before the negotiations were completed, and his replacement, L.W. French, was never qualified to act as a Commissioner and took no part in the negotiations. S.Exec.Doc. No. 27, 53rd Cong., 2d Sess. at 7–8, 34 (1894); (Pl.Ex. 5.) The Commission arrived at the Yankton Sioux Reservation on October 1, 1892, and began negotiating for the sale of the surplus lands at tribal councils called for that purpose. The transcribed minutes of these tribal councils reveal that the Commissioners encouraged the Yankton Sioux to voice their concerns and opinions, and that many spoke out, both for and against the sale. *Id.* at 47–81.

The Commission and the tribal members discussed at length whether the Tribe should cede the land in trust for later appraisal and sale to individual buyers or whether the Tribe should cede the land in a direct sale to the federal government. The Agreement ultimately reached provided for direct sale to the government. *Id.* at 12. The negotiators had extensive difficulty in establishing a price for the ceded land, and it was claimed that price was "[t]he only real grounds for opposition." *Id.* at 22. The Indians wanted no less than $6.00 per acre for the surplus lands; the Commission reported the Indians thought their lands should bring "fabulous prices." *Id.* at 13. The Commission and the required majority of the males of the Tribe finally agreed to a cession of the land for the fixed price of $600,000, which amounted to about $3.60 per acre. The Commission re-

ported to the Secretary of the Interior that this figure was "as low as these lands could be purchased from them without coercion, and about what they think they should receive." *Id.* at 14. Aside from the issue of price, some time was taken, according to Commissioner John J. Cole, in preparing both the rough draft and the final version of the 1892 Agreement:

> In drawing the treaty we have consulted with your missionaries almost daily, submitting to them our work and asking for their assistance in this matter. After making a complete rough draft of the treaty, we on the 10th instant submitted it to Secretary Noble for his consideration and approval.

*Id.* at 83–84. The changes Secretary Noble requested were made and the Agreement was then submitted to the missionaries, including John P. Williamson. *Id.* at 84.

In its report on the negotiations, the Commission also acknowledged that obtaining the sale of the surplus lands was "but a small part of our mission and of minor importance to both the Indians and the Government, the provisions in connection therewith for the future welfare of the Indians being of greater importance to them and to the Government than the sale of their surplus lands." *Id.* at 17. The Commission reported that the Indians expressed the fear that opening of the Yankton Reservation to settlement by white people would bring with it the establishment of drinking saloons, to the great injury of their people. To alleviate the Tribe's concern, Article XVII, limiting the sale and distribution of liquor on the ceded lands, was included in the Agreement. *Id.* at 21. The Commissioners also noted that it was cus-

tomary in negotiating with Indians to give a medal to the chiefs, "but as the Yanktons are so far advanced toward individual citizenship, we thought it best to meet this requirement as in Article VII" by giving a $20 gold piece to each adult male of the Tribe. *Id.* at 19.

The negotiations culminated on December 31, 1892, in a final written agreement for the sale of the surplus land to the federal government at a fixed price, (State Ex. 601), and by March 1893, when the Commissioners left the Yankton Sioux Reservation to return to Washington, the required majority of adult male members of the Tribe had signed the Agreement.[1] *Id.* at 7. The Commission reported that, when agreement with the Tribe was reached, the Commission:

> called together small parties of the chiefs, headmen, and leaders, and conferred with them in drawing the agreement, and after it was written, we continued to call such small councils, to whom we read and explained the agreement for the benefit of the tribe. This work was continued from day to day until the 21st day of January, when we called a full council of the tribe, sending couriers to all parts of the reservation to notify the Indians that we would submit an agreement for their approval. The agreement was submitted, read, interpreted and explained to a full council, at the close of which we took between fifty and sixty signatures to it. Councils for signature were continued from day to day until March 8, when, having a safe majority, we closed up the work of the commission on the reservation.

*Id.* at 11. Of the 458 male tribal members eligible to vote on the Agreement, 255 mem-

---

1. The 1892 Agreement contains the following important provisions:
ARTICLE I. "The Yankton tribe of Dakota or Sioux Indians hereby cede, sell, relinquish, and convey to the United States all their claim, right, title, and interest in and to all the unallotted lands within the limits of the reservation set apart to said Indians as aforesaid."
ARTICLE II. "In consideration for the lands ceded, sold, relinquished, and conveyed to the United States as aforesaid, the United States stipulates and agrees to pay to the said Yankton tribe of Sioux Indians the sum of six hundred thousand dollars ($600,000), as hereinbefore provided for."

ARTICLE XVIII. "Nothing in this agreement shall be construed to abrogate the treaty of April 19th, 1858, between the Yankton tribe of Sioux Indians and the United States. And after the signing of this agreement, and its ratification by Congress, all provisions of the said treaty of April 19th, 1858, shall be in full force and effect, the same as though this agreement had not been made, and the said Yankton Indians shall continue to receive their annuities under the said treaty of April 19th, 1858."
(Pl.Exs. 2, 5.)

bers signed it. *Id.* at 21. One-half of the white men married to Indian women gave their consent to the Agreement by signing on a separate page attached to the Agreement. *Id.* at 16–17. United States Interpreter C.F. Picotte certified that the Agreement "was read verbatim and carefully and correctly interpreted in an open council of the tribe," and that the Agreement was "also read and interpreted to the chiefs and to various parties of the headmen, and all members of the tribe had a good understanding of the various provisions of the agreement before signing it." *Id.* at 33.[2]

The Report of the Yankton Indian Commission, dated March 31, 1893, was filed in the Department of the Interior on May 27, 1893. Annual Report of the Commissioner of Indian Affairs dated September 16, 1893. (Pl.Ex. 10.) The Commission reported to Washington officials that "[t]here will be no basis for misunderstanding or discontent in carrying out this agreement with the Yanktons, for everything was done openly and aboveboard, and they well understood every provision of the agreement which they signed, and they signed with the greatest possible deliberation." *Id.* at 24. The Yankton chiefs, headmen, and certain members of the Tribe sent letters and petitions to Congress in December 1893 and in January and March 1894 acknowledging that the agreement negotiations had occurred "aboveboard" and that the signers willingly agreed to the Agreement's provisions. They urged Congress to ratify the Agreement quickly so that the Indians could receive from the federal government the money promised to them. S.Rep. Accompanying S. 1538 from the Committee on Indian Affairs at 2 (February 1, 1894); (Pl.Ex. 7); March 2, 1894 Letter to the Chairman, Committee Indian Affairs (State's Exs. 606–07); (Pl.Ex. 21.)

The legislative history of the Agreement leaves no doubt, however, that the faction of the Yankton Sioux opposed to the land sale vehemently worked against the Agreement. Two federal investigators were sent separately to the Yankton Sioux Reservation in 1893 to investigate allegations of fraud in the procurement of signatures on the Agreement. Indian Inspector John W. Cadman reported in November 1893 that he had uncovered only one incident of possible undue influence, but that he did not believe such had occurred in that case. He also reported that some tribal members who had signed the Agreement wished to change their minds, while others wished to sign the Agreement for the first time. S.Exec.Doc. No. 27, 53rd Cong., 2d Sess. at 35 (1894); (Pl.Ex. 5; State Ex. 605.) Special Agent Cooper also found no evidence of coercion by the Commissioners in reaching the Agreement. *Id.* at 95.

In a letter to the Secretary of the Interior, subsequently referred to Congress with the 1892 Agreement, the Acting Commissioner of Indian Affairs, Frank C. Armstrong, stated that the Yankton Indian Commission was appointed in 1892

[t]o enable the Secretary of the Interior to negotiate with any Indians for the surrender of any portions of their reservation, etc.

By the first article of the agreement the said Indians cede, sell, relinquish, and convey to the United States, all their claim, right, title, and interest, in and to all the unallotted lands within the limits of their reservation in South Dakota.

S.Exec.Doc. No. 27, 53rd Cong., 2d Sess., at 2 (1894). (Pl.Ex. 5.) The letter also states, however, that "[t]he treaty makes no provision regarding the cession or relinquishment

---

**2.** In contradiction to this, Indian Agent E.W. Foster of the Yankton Agency told the Commissioner of Indian Affairs of the Department of the Interior, in a May 1893 letter and in his 1893 annual report, that the Yankton Indian Commissioners read the 1892 agreement in public once, they did not leave a copy in South Dakota when they left the reservation, and many times the Indians asked Foster to show them the document, but he did not have a copy. *See* Report of the Commissioner of Indian Affairs, Dept. of the Interior at 311 (Sept. 14, 1894); (Pl.Ex. 10;

May 2, 1893 Letter of E.W. Foster (Pl.Ex. 26). It appears from the record that Agent Foster opposed the sale of surplus lands, and he told the Tribe at the first tribal council with the negotiators in October 1892 that they did not have to sell their surplus lands unless they wanted to. S.Exec.Doc. No. 27, 53rd Cong., 2d Sess. at 48 (1894); (Pl.Ex. 5). The Yankton Sioux apparently did not trust Foster, however, for the Indians made it known that they "were willing to negotiate for sale of surplus as long as Sgt. Foster [had] no hand in such negotiations." (Pl.Ex. 28.)

of the reservation or any portion thereof." *Id.* at 5. The preamble to the bill to ratify the 1892 agreement nonetheless stated that the Yankton Sioux Tribe "is willing to dispose of a portion of the land set apart and reserved to said tribe, by the first article of the treaty" of April 19, 1858. *Id.* at 26.

The February 1, 1894 Senate Report from the Committee on Indian Affairs, accompanying S. 1538, recommended ratification of the Agreement with the Yankton Sioux because "[t]he occupation of the land released by them by actual settlers under the homestead law bringing them in close contact with the frugal, moral, and industrious people who will settle there will stimulate individual effort and make their progress much more rapid than heretofore." (Pl.Ex. 7; State Ex. 608.) *See also* House Report to Accompany H.R. 6216 (Mar. 10, 1894); (Pl.Ex. 8; State Ex. 609.) Congress ratified the 1892 Agreement with the Yankton Sioux on August 15, 1894. 28 Stat. 314–19. One month later, the Commissioner of Indian Affairs commented in his annual report:

> The agreement concluded with the ... Yankton Sioux in South Dakota, concluded December 31, 1892, ... referred to in my last annual report, [was] ratified by the act of Congress approved August 15, 1894— the Indian appropriation act. Under these agreements some 880,000 acres of land *will be restored to the public domain* for disposition as provided in said act."

Annual Report of Commissioner of Indian Affairs, dated September 16, 1894, at 26 (emphasis added). (Pl.Ex. 11.)

On May 16, 1895, President Grover Cleveland issued a Proclamation opening for settlement the unallotted lands ceded by the Yankton Sioux to the United States, noting that "the said Yankton tribe of Sioux or Dacotah Indians, for the consideration therein mentioned, ceded, sold, relinquished, and conveyed to the United States, all their claim, right, title, and interest in and to all the unallotted lands within the limits of the reservation set apart to said tribe by the first article [of the 1858 treaty]." Annual Report of the Commissioner of the General Land Office for The Fiscal Year Ending June 30, 1895 at 120–21; (Pl.Exs. 6, 35; State Ex.

602.) The unallotted lands were officially opened for settlement at 12 noon on May 21, 1895. *Id.* at 5. (Pl.Ex. 6.) Non–Indians rapidly settled and purchased the lands ceded by the Yankton Sioux. (Pl.Ex. 58, 61–64, 66.) In fact, some settlers squatted on the lands without authority even before the issuance of the presidential proclamation opening the land for settlement. (Pl.Ex. 27.)

■ With this historical context in mind, the Court now turns to an examination of the "most probative evidence" of diminishment or disestablishment: the language of the Agreement. Article I of the 1892 Agreement provided that the Yankton Sioux

> hereby cede, sell, relinquish, and convey to the United States all their claim, right, title, and interest in and to all the unallotted lands within the limits of the reservation set apart to said Indians as aforesaid.

In Article II, the United States agreed that,

> [ ]in consideration for the lands ceded, sold, relinquished, and conveyed to the United States as aforesaid, the United States stipulates and agrees to pay to the said Yankton tribe of Sioux Indians the sum of six hundred thousand dollars ($600,000), as hereinbefore provided for.

These two Articles of the Agreement, taken together and without consideration of Article XVIII, plainly indicate that the Yankton Sioux were willing to convey to the United States, for payment of a sum certain, all of their interest in all of their unallotted lands. *See DeCoteau,* 420 U.S. at 445, 95 S.Ct. at 1093. The explicit cession language used in Article I, coupled with the agreement to sell lands for a sum certain in Article II, was "precisely suited to [the] purpose [of disestablishment]." *Id.* *See also, Rosebud Sioux Tribe v. Kneip,* 430 U.S. 584, 592, 97 S.Ct. 1361, 1366, 51 L.Ed.2d 660 (1977). If Article XVIII had not been included in the Agreement, the language utilized in these two Articles would establish "a nearly conclusive presumption that the reservation had been diminished." *See Hagen,* —— U.S. at —— – ——, 114 S.Ct. at 965–66. *See also Perrin v. United States,* 232 U.S. 478, 480, 34 S.Ct. 387, 388, 58 L.Ed. 691 (1914) (referring to the "ceded lands formerly included in the

Yankton Sioux Indian Reservation" when construing Article XVII, the liquor provision, of the 1892 Agreement with the Yankton Sioux). The fact that lands were considered by the Court in *Perrin* as ceded does not mean that the boundaries were diminished, as that issue was not addressed.

The Court must further consider, however, the meaning and impact of Article XVIII:

Nothing in this agreement shall be construed to abrogate the treaty of April 19th, 1858, between the Yankton tribe of Sioux Indians and the United States. And after the signing of this agreement, and its ratification by Congress, all provisions of the said treaty of April 19th, 1858, shall be in full force and effect, the same as though this agreement had not been made, and the said Yankton Indians shall continue to receive their annuities under the said treaty of April 19th, 1858.

The Court focuses upon the phrases "[n]othing in this agreement shall be construed to abrogate the treaty of April 19th 1858," and "all provisions of the said treaty of April 19th, 1858, shall be in full force and effect, the same as though this agreement had not been made[.]" The extensive post-trial research of the parties to this case reveals no other treaty or agreement made between the United States and an Indian tribe that includes this identical language. There are treaties and agreements that include savings clauses; however, the language used in such clauses is far from uniform. The parties cite to the Court numerous examples of savings clauses in other agreements providing that treaty provisions shall remain in force or continue in force to the extent those treaty provisions are not inconsistent with the provisions of a subsequent act. (Doc. 97 at 5–8; Doc. 94 at 4–6, 9–12.) The State also cites decisions of the United States Supreme Court in which such savings clauses did not affect the Court's ultimate finding of reservation diminishment or diminution of special Indian rights. *Oregon Dept. of Fish and Wildlife v. Klamath Indian Tribe*, 473 U.S. 753, 105 S.Ct. 3420, 87 L.Ed.2d 542 (1985); *Rosebud Sioux Tribe v. Kneip*, 430 U.S. 584, 97 S.Ct. 1361, 51 L.Ed.2d 660 (1977); *Chippewa Indians of*

*Minnesota v. United States,* 301 U.S. 358, 57 S.Ct. 826, 81 L.Ed. 1156 (1937); *Shoshone Tribe of Indians v. United States,* 299 U.S. 476, 57 S.Ct. 244, 81 L.Ed. 360 (1937). The Court has considered the other clauses and cases cited by the parties, but finds them to be of little help in resolving this case. No other clause contains language as forceful as Article XVIII.

The Court finds that the phrase in Article XVIII that "all provisions of the said treaty of April 19th, 1858, shall be in full force and effect, the same as though this agreement had not been made," when read with the clear cession and sale clauses of Articles I and II, creates an internal inconsistency in the 1892 Agreement. Construing this ambiguity in favor of the Tribe as the Court must do, *see Hagen,* —— U.S. at ——, 114 S.Ct. at 965, the Court concludes, as the Tribe argues, that the effect of Article XVIII is to incorporate by reference the exterior boundaries of the Yankton Sioux Reservation as set out in the 1858 treaty.

The circumstances surrounding the ratification of the 1892 Agreement fail to establish a clear congressional purpose to disestablish the reservation boundaries. In referring the 1892 Agreement to Congress for ratification, Acting Commissioner of Indian Affairs Frank Armstrong reminded Congress that the Yankton Indian Commission was appointed under the authority of the Act of July 13, 1892, so that the Secretary of the Interior could "negotiate with any Indians for the surrender of any portions of their reservation." S.Exec.Doc. No. 27, 53rd Cong., 2d Sess., at 2 (1894) (emphasis added). (Pl.Ex. 5.) Armstrong then informed Congress that, by Article I of the 1892 Agreement, "the said Indians cede, sell, relinquish, and convey to the United States, all their claim, right, title, and interest in and to all the unallotted lands *within the limits of their reservation* in South Dakota." *Id.* (emphasis added). He informed Congress that "Article XVIII provides that nothing in the agreement shall be construed to abrogate the treaty of April 19, 1858, and that the Yankton Indians shall continue to receive their annuities under said treaty." *Id.* at 4. Most importantly, Armstrong also observed that the Agreement

"*makes no provision regarding the cession or relinquishment of the reservation* or any portion thereof." S.Exec.Doc. No. 27, 53rd Cong., 2d Sess., at 5 (1894) (emphasis added). (Pl.Ex. 5.) The transcribed minutes of the tribal councils held by the Yankton Indian Commission to negotiate the Agreement with the Yankton Sioux, which are included in the legislative history of the ratifying Act, do not divulge any discussion that might have taken place as to the meaning the parties to the Agreement gave to Article XVIII, and there is no discussion as to whether the Yankton Sioux or the negotiators believed the 1858 boundaries of the reservation would change. *Id.* at 47–97. John P. Williamson was one of the missionaries to whom the final version of the 1892 Agreement was submitted.[3] In his letter of January 3, 1893, from Greenwood, South Dakota, on the reservation, Rev. Williamson wrote: "I have read the agreement you present the Yankton Indians ... [and in conclusion] and further there is no cause for apprehension that this agreement will in any way interfere with the treaty of 1858." S.Exec.Doc. No. 27, 53rd Cong., 2d Sess., at 84 (1894). (Pl.Ex.5.) The Court can find no other mention of Article XVIII in the legislative history of the ratification Act.

The Court therefore concludes that Congress reasonably could have understood, by reason of the communications it received from the Commissioner of Indian Affairs through the Secretary of the Interior, particularly in light of no other indications to the contrary, that the Yankton Sioux intended to cede the surplus lands within the exterior boundaries of the reservation, but that they did not intend to relinquish the boundaries established in the 1858 treaty. The Court's conclusion in this regard is supported by the fact that Congress stated in the preamble to the ratification bill that the Yankton Sioux Tribe "is willing to dispose of a portion of the land set apart and reserved to said tribe, by the first article of the treaty" of April 19, 1858. *Id.* at 26. Congress did not expressly

state in the ratification bill that the boundaries would be diminished or disestablished, and such congressional intent is not clear from the surrounding circumstances and legislative history. *See Solem,* 465 U.S. at 474, 104 S.Ct. at 1168 ("Nowhere else in the [Cheyenne River] Act is there specific reference to the cession of Indian interests in the opened lands or any change in existing reservation boundaries.") Without such clear congressional intent, the general rule applies that doubtful expressions must be resolved in favor of the Tribe. *See DeCoteau,* 420 U.S. at 445, 95 S.Ct. at 1093 (once Congress establishes a reservation, all tracts included within it remain part of the reservation until separated from it by Congress).

Historical events following ratification of the Agreement are not entirely at odds with a determination that the exterior boundaries remained intact, although there is some evidence that the reservation was treated as if it had been diminished or disestablished. *See Hagen,* —— U.S. at —— – ——, 114 S.Ct. at 965–66; *Solem,* 465 U.S. at 471, 104 S.Ct. at 1166. Illustrative of this latter type of evidence are maps issued by private publishers in 1904, 1906, and 1912 which treated the Yankton Sioux Reservation as if its exterior boundaries no longer existed. (State Exs. 630–32.) Also, the State introduced into evidence a February 21, 1921 letter regarding construction of a spillway and drainage ditch to maintain the level of Lake Andes, in which Secretary of the Interior Payne stated that Lake Andes is "within the former Yankton–Sioux Indian Reservation." (State Ex. 665.) Having carefully reviewed all similar evidence presented by the State, (State's Exs. 604, 627–28, 651–52, 667–68), the Court finds that the evidence is insufficient to prove that *de facto* diminishment or disestablishment occurred.

One month after Congress ratified the Agreement, the Commissioner of Indian Af-

---

3. Rev. John P. Williamson was a well regarded Presbyterian missionary among the Yankton Sioux. *See, e.g.,* Eastman, *From the Deep Woods to Civilization,* 48 (Little, Brown and Company 1916). Rev. Williamson lived near the Yankton Agency at Greenwood from 1869 to 1916 and was the first resident missionary of any denomi-

nation among the Indians within the bounds of what is now South Dakota and interceded for the Yankton Sioux with President Grant in 1873. Sister Mary Claudia Duratschek, *Crusading Along Sioux Trails,* 268, 275 (Grail Publication 1947).

fairs stated that the effect of the Agreement was to return land to the public domain "as provided in said act." Annual Report of Commissioner of Indian Affairs, dated September 16, 1894, at 26. (Pl.Ex. 11.) A return of surplus lands to the public domain is consistent with a conclusion that the Ratification Act opened the surplus lands for settlement only and did not change the reservation boundaries. *See Solem,* 465 U.S. at 474, 104 S.Ct. at 1168. Upon ratification, President Cleveland opened the unallotted lands for settlement, noting in his Proclamation that the Yankton Sioux had ceded and relinquished to the United States all the unallotted lands "within the limits of the reservation set apart to said tribe by the first article [of the 1858 treaty]." Annual Report of the Commissioner of the General Land Office for The Fiscal Year Ending June 30, 1895 at 120–21. (Pl.Exs. 6, 35; State Ex. 602.) This proclamation is consistent with the conclusion that the boundaries remained intact while the unallotted lands were opened to settlement.

White settlers rapidly entered and settled the opened areas of the reservation. Census data show that the population of Charles Mix County increased by 103.4 percent between 1890 and 1900, and of the 8,498 persons residing in Charles Mix County in 1900, only 1,483 were Indian. (State Exs. 612–13.) By 1910, the Indian population in Charles Mix County had dropped to 1,345, and Indian land holdings had dropped dramatically by 1914. (Pl.Exs. 22, 25; State Exs. 613, 623.) This evidence tends to show that the opened lands quickly lost their Indian character. However, of particular concern to the Yankton Sioux during this time period were attempts by the Commissioner of School and Public Lands for the State of South Dakota to select for State purposes land ceded in the 1892 Agreement, as the Yankton Sioux preferred stable white settlers for neighbors rather than cowboys who would graze livestock on lands leased from the State. (Pl. Exs. 17, 19–20, 27, 56, 76.) This is some evidence that the Yankton Sioux believed that the reservation boundaries had not changed and that they could exercise some influence within Congress or executive agencies to determine the use to be made of the opened lands.

Official government reports, documents, and maps issued in the years between 1894 and 1923 sometimes referred to the Yankton Sioux Reservation as if the 1858 exterior boundaries remained intact, and at other times treated the area within the 1858 exterior boundaries as "allotted or opened" or as a "former reservation." (Pl.Exs. 30, 34–55; State Exs. 612–14, 617, 619–22, 625–26, 666.) Thus, the government itself did not take a clear position as to whether the reservation had been diminished or disestablished. In a letter dated May 13, 1910, the Commissioner of Indian Affairs informed the Yankton Sioux that lands ceded under the 1892 Agreement became public lands, (State. Ex. 664), but this is not inconsistent with a conclusion that the reservation boundaries remained intact. Beginning as early as 1895, state courts exercised civil and criminal jurisdiction in the opened area of the reservation, (State Exs. 633–38); however, this fact in itself does not confirm that the exercise of state jurisdiction was appropriate, nor is it inconsistent with the existence of shared jurisdiction by the state, tribe and federal government within the opened area of an existing Indian reservation. *See Solem,* 465 U.S. at 467, 104 S.Ct. at 1164. Within the last sixty years, the Yankton Sioux Tribe has taken steps to assert tribal jurisdiction, although those efforts have not completely come to fruition.

In 1932 the Yankton Sioux Tribal Business and Claims Committee wrote a Constitution and Bylaws, but this Constitution was silent as to the extent of jurisdiction asserted by the Tribe. (State Ex. 651.) Trial testimony revealed that the Business and Claims Committee was suspended from 1936 through 1965 and did not operate during that time, although two or three other limited purpose committees were developed by tribal members. In 1962 the Yankton Sioux Tribal Business and Claims Committee was re-established and adopted an Amended Constitution and Bylaws, certain sections of which were again amended in 1975. (State Ex. 652.) The Amended Constitution provided that "[t]he territory under which this Constitution shall exist shall extend to all original

Tribal lands now owned by the Tribe under the Treaty of 1858." (*Id.*)

In a Department of Interior Solicitor's Opinion, "Authority Of Yankton Sioux Tribe Of South Dakota To Establish A Tribal Court," the Associate Solicitor stated:

> The cession of unallotted lands by the Yankton Sioux Tribe by the Agreement of December 31, 1892, as ratified by the Act of August 15, 1894, 28 Stat. 314, diminished the area over which the tribe might exercise its authority but did not otherwise terminate legislative authority of the tribe; the tribe retained inherent authority to administer justice through a tribal court. The result of a cession of all unallotted lands was to leave in Indian control lands in a checkerboard pattern. The impracticality of such jurisdiction is recognized. (cases omitted) However, as stated in *De Marrias*, the checkerboard jurisdiction stems from the acts of Congress and therefore had the approval of Congress. *De Marrias* [*v. State of South Dakota*, 206 F.Supp. 549, 551 (D.S.D.1962), *aff'd*, 319 F.2d 845 (8th Cir.1963) ].

(State Ex. 628 at 4.) Since the mid-1960's, the State of South Dakota has exercised jurisdiction over mining, solid waste disposal, and hazardous materials on non-Indian lands located within the 1858 exterior boundaries of the Yankton Sioux Reservation. (State Exs. 640–46, 647–50.) Plaintiffs presented no evidence that, since 1894, the Tribe has exercised civil jurisdiction, particularly environmental regulation, over Indians or non-Indians beyond its trust lands. Yankton Sioux Tribal Chairman Darrell Drapeau specifically testified that he seeks tribal solid waste regulation over Indians only, and not over non-Indians located on lands within the 1858 exterior boundaries of the Yankton Sioux Reservation.

Although there is evidence that governmental and private entities often treated the Yankton Sioux Reservation as if it had been diminished or disestablished, the Court holds for the reasons previously stated that the 1892 Agreement, ratified by Congress in 1894, did not disestablish or diminish the exterior boundaries of the Yankton Sioux Reservation as set out in the 1858 Treaty.[4]

■ Nonetheless, "when Congress has broadly opened up ... land to non-Indians, the effect of the transfer is the destruction of pre-existing Indian rights to regulatory control." *South Dakota v. Bourland*, —— U.S. ——, ——, 113 S.Ct. 2309, 2318, 124 L.Ed.2d 606 (1993). Indian tribes retain inherent authority to punish members who violate tribal law, to regulate tribal membership, and to conduct internal tribal relations, but the " 'exercise of tribal power beyond what is necessary to protect tribal self-government or to control internal relations is inconsistent with the dependent status of the tribes, and so cannot survive without express congressional delegation[.]' " *Id.* at ——, 113 S.Ct. at 2319 (quoting *Montana v. United States*, 450 U.S. 544, 564, 101 S.Ct. 1245, 1258, 67 L.Ed.2d 493 (1981)). Plaintiffs have provided no evidence to prove that Congress intended to allow the Tribe to assert regulatory jurisdiction over non-Indian lands within the exterior boundaries of the reservation pursuant to inherent sovereignty. The Court also finds that plaintiffs failed to produce sufficient evidence to warrant application of the second *Montana* exception in this case. *See Brendale v. Confederated Tribes and Bands of the Yakima Indian Nation*, 492 U.S. 408, 424, 109 S.Ct. 2994, 3004–05, 106 L.Ed.2d 343 (1989) (plurality); *Montana*, 450 U.S. at 566, 101 S.Ct. at 1258. Plaintiffs produced no evidence regarding impact of the proposed municipal solid waste landfill on the political integrity, economic security, or health and welfare of the Tribe except for very limited and somewhat contradictory testimony by Tribal Chairman Darrell Drapeau. Accordingly, the Tribe may not assert civil jurisdiction over the municipal solid waste landfill that is proposed to be built on non-Indian land within the exterior boundaries of the Yankton Sioux Reservation.

## II. Regulation of the Municipal Solid Waste Landfill

The Southern Missouri Recycling and Waste Management District, formerly known

---

4. This holding does not affect the validity of the holding of record title to real estate within the exterior boundaries of the Yankton Sioux Reservation.

as the Southern Missouri Waste Management Association, came into existence on February 5, 1992, for the purpose of constructing a municipal solid waste disposal facility in compliance with state solid waste disposal regulations and federal Environmental Protection Agency (EPA) Subtitle D regulations. Faced with a federal mandate to close unregulated town dump sites by October 6, 1995, community leaders formed Southern Missouri to develop a solid waste disposal facility that will serve approximately 25,000 residents located in four counties and numerous communities. Although tribal representatives regularly attended Southern Missouri's meetings, the Yankton Sioux Tribe did not sign the joint powers agreement or become an official member of the organization.

Southern Missouri selected a site for the landfill west of Lake Andes, in Charles Mix County, South Dakota. The site is located on land formerly owned by a non-Indian, Kenneth McBride, within the exterior boundaries of the Yankton Sioux Reservation. Southern Missouri purchased the parcel from McBride and filed an application with the State of South Dakota, Department of Environment and Natural Resources (DENR), to obtain a permit to construct and operate the landfill. Following review of Southern Missouri's application and subsequent submissions, DENR recommended approval of the permit to the Board of Minerals and Environment.

On October 4, 1993, the Yankton Sioux Tribe filed with the Board of Minerals and Environment a Petition For A Contested Case Hearing, a Motion to Intervene, and a Request For An Environmental Impact Statement. (State Ex. 653.) The Board Chairman accepted the petition to intervene and granted party status to the Tribe, but denied the Tribe's request for an Environmental Impact Statement. (State Exs. 654, 656.)

On December 8–10 and December 20, 1993, the Board of Minerals and Environment conducted a lengthy contested case hearing regarding Southern Missouri's application for a permit. The Yankton Sioux Tribe, represented by counsel at the hearing, presented evidence and cross-examined witnesses called by other parties. (State Ex. 675 Tr. Vols. 1–4.) Several of the witnesses who testified at the trial in this action also testified at the state administrative hearing, among them the engineers who designed Southern Missouri's facility and the Tribe's experts, Dr. Henry Mott and Dr. Perry Rahn. The Court finds that the testimony given in the two proceedings is virtually identical.

At the conclusion of the contested case hearing, the Board filed extensive Findings of Fact And Conclusions of Law granting Southern Missouri the requested permit. (State Ex. 657.) Based upon a careful review of the evidence, the Board rejected the concerns raised by the Tribe's experts as to (1) inadequacy of the proposed compacted clay liner; (2) location of major acquifers underlying the site; (3) potential groundwater mounding beneath the site; (4) inadequate drilling of test wells; (5) the presence of fissures or lineaments, as well as sand and gravel lenses, at the site that might assist the migration of leachate into ground water and acquifers; (6) and the inadequacy of the methane gas and leachate collection systems. The Board specifically found that South Dakota solid waste regulations do not require the installation of a synthetic composite liner over the compacted clay liner, and therefore, the Board did not order its installation. The Board found that the facility will not cause significant adverse effect on wildlife, recreation, endangered species, or aesthetic value; the facility is not located within one thousand feet of water classified for fish life propagation; it is not located within an area where leachate can potentially contaminate ground water; it is not located within the 100–year flood plain; it is not visible or within one thousand feet of a public park; and it is in an area that does not constitute a potential safety hazard to the public. The Board determined that the permit would be subject to certain conditions attached to it and incorporated by reference. The permit issued to Southern Missouri contains conditions relating to design and construction, monitoring, operations, recordkeeping and reporting, and financial assurance. Particularly, Southern

Missouri is required to conduct soil tests while the compacted clay liner is under construction to assure that the liner will achieve the proposed impermeability rating of $1 \times 10(-7)$ cm/sec. (State Ex. 659.)

The Tribe did not seek review of the administrative ruling in the state circuit court as permitted by state law. Another party to the contested case hearing called VOTE, which was also represented by the Tribe's attorney, did seek judicial review, and the Sixth Judicial Circuit Court affirmed. (State. Ex. 658.) No appeal was taken to the South Dakota Supreme Court. The Tribe then filed this federal lawsuit seeking to enjoin construction of Southern Missouri's solid waste facility.

The Court held in the previous section of this Opinion that the Tribe did not meet its burden to prove at trial that it may exercise civil jurisdiction over this proposed landfill. The Court must nonetheless consider the Tribe's argument that federal EPA regulations apply to this solid waste disposal facility, and not state regulations, because EPA has not delegated to the State of South Dakota its permitting and enforcement authority over lands located within the exterior boundaries of the Yankton Sioux Reservation.

The Tribe is correct that on October 8, 1993, EPA exempted "Indian Country" as defined in 18 U.S.C. § 1151, including the "existing or former" Yankton Sioux Reservation, from its final determination of the adequacy of South Dakota's State/Tribal Municipal Solid Waste Permit Program. 58 Federal Register 52486–52489, October 8, 1993; (State Ex. 661.) On April 7, 1994, however, the EPA published notice of its tentative determination of adequacy of the State's amended Municipal Solid Waste Permit Program over non-Indian lands, except for "Indian Country" as defined in § 1151, within the boundaries of the Yankton Sioux Reservation. 59 Federal Register 16647–16649, April 7, 1994; (State Ex. 662.)

On November 10, 1994, William Yellowtail, Regional Administrator for the EPA, in a letter to Robert Roberts, Secretary of the South Dakota Department of Environment and Natural Resources, stated EPA's position that federal regulations apply to Southern Missouri's site because the facility lies within the exterior boundaries of the reservation. Yellowtail asserted EPA's view that the federal regulations would require installation of the synthetic liner, although he acknowledged that EPA had yet to make a final decision on the State's amended application for enforcement authority over all non-Indian lands within the exterior reservation boundaries. (Pl.Ex. 69.) In response, on March 14, 1995, the State requested that EPA take no further action on its amended application pending the outcome of this lawsuit. (State Ex. 675 File Vol. 1, Correspondence.) The Tribe has also applied for EPA enforcement authority over lands within the exterior reservation boundaries, and that application is pending before the EPA. (Pl.Ex. 57.)

■ The Court finds that, until the EPA takes final action to approve or disapprove either the State's or the Tribe's applications, federal EPA regulations apply to Southern Missouri's proposed solid waste disposal facility. The evidence shows that the EPA takes the position that a synthetic liner is required in addition to the compacted clay liner to bring Southern Missouri's design into compliance with Subpart D, 40 C.F.R. § 258.40. The Court will require Southern Missouri to install a composite liner as defined in 40 C.F.R. § 258.40(b) because a composite liner and leachate collection system is required where noncontainerized leachate derived from the solid waste disposal facility will be recirculated into the cells, as is proposed in Southern Missouri's design and operation. 40 C.F.R. § 258.28(a)(2). Plaintiff's expert, Dr. Henry Mott, testified that his concerns regarding the adequacy of the compacted clay liner and the leachate collection system would be alleviated if Southern Missouri were required to install a composite liner. At trial, Southern Missouri offered to construct the proposed facility with a composite liner. Now that the Court is requiring installation of the composite liner, these concerns are fully addressed.

As Dr. Perry Rahn testified, the EPA regulations do not require a facility design that prepares for a worst case scenario. The

Court has carefully considered all of the testimony given by the witnesses at trial regarding the adequacy of the site selection and the design of Southern Missouri's proposed facility. As to all remaining factual issues, this Court makes the same findings as those made by the South Dakota Board of Minerals and Environment. The Court finds credible the testimony of the engineers who designed the facility for Southern Missouri, Brian Bernhardt and John Childs. The Court is convinced that in designing the facility these engineers appropriately considered the concerns raised by the Tribe's experts as to groundwater mounding, sand and gravel lenses, fissures and lineaments, acquifers, test borings, and methane gas collection. All of these matters have been adequately addressed in the design of the facility, which complies fully with EPA regulations once the composite liner is required. Accordingly,

IT IS ORDERED:

(1) that Congress did not disestablish or diminish the boundaries of the Yankton Sioux Reservation when it ratified the 1892 Agreement with the Yankton Sioux Tribe and therefore, the exterior boundaries of the reservation, as set out in the 1858 Treaty, remain intact.

(2) that plaintiffs failed to establish that the Yankton Sioux Tribe may exercise regulatory jurisdiction over the municipal solid waste landfill proposed to be built by Southern Missouri Recycling and Waste Management District on non-Indian land located within the exterior boundaries of the Yankton Sioux Reservation.

(3) that Southern Missouri Recycling and Waste Management District may proceed with construction of its solid waste disposal facility at the site selected.

(4) that, during construction of the solid waste disposal facility, Southern Missouri will install a composite liner as defined in 40 C.F.R. § 258.40(b).

(5) that all other relief requested by plaintiffs is denied.

## JUDGMENT

In accordance with the Memorandum Opinion and Order filed this date with the Clerk,

IT IS ORDERED, ADJUDGED, AND DECREED:

(1) that judgment is entered in favor of plaintiffs and against defendant and third-party defendant on the disestablishment issue, as Congress did not disestablish or diminish the boundaries of the Yankton Sioux Reservation when it ratified the 1892 Agreement with the Yankton Sioux Tribe and therefore, the exterior boundaries of the reservation, as set out in the 1858 Treaty, remain intact.

(2) that judgment is entered in favor of defendant and third-party defendant and against plaintiffs on the regulatory issue, as plaintiffs failed to establish that the Yankton Sioux Tribe may exercise regulatory jurisdiction over the municipal solid waste landfill proposed to be built by Southern Missouri Recycling and Waste Management District on non-Indian land located within the exterior boundaries of the Yankton Sioux Reservation.

(3) that judgment is entered permitting Southern Missouri Recycling and Waste Management District to proceed with construction of its solid waste disposal facility at the site selected; however, during construction of the solid waste disposal facility, Southern Missouri is required to install a composite liner as defined in 40 C.F.R. § 258.40(b).

(4) that judgment is entered in favor of defendant and third-party defendant and against plaintiffs on all other grounds of relief requested by plaintiffs.

(5) that judgment is entered with prejudice.