99 F.3d 1439
 27 Envtl. L. Rep. 20,374
 YANKTON SIOUX TRIBE, a federally recognized tribe of
Indians, and its individual members; Darrell E.
Drapeau, individually, a member of the
Yankton Sioux Tribe,
Plaintiffs-Appellees,
v.
SOUTHERN MISSOURI WASTE MANAGEMENT DISTRICT, a non-profit
corporation, Defendant-Third Party, Plaintiff-Appellee,
v.
STATE OF SOUTH DAKOTA, Third Party Defendant-Appellant.
Charles Mix County, South Dakota; Flandreau Santee Sioux
Tribe, Inc.; United States of America; Amicus Curiae.
Vine Deloria, Jr.; Philip S. Deloria; Philip Lane, Sr.;
Philip Lane, Jr.; James Weddell, Descendants of Francois
Deloria, Signatory to the Treaty of 1858, and Descendants
and Relatives of Philip J. Deloria, Chief of Band Eight of
the Yankton Sioux Tribe, at the time of the negotiation and
ratification of the agreement of December 31, 1892, Amici Curiae.
 No. 95-2647.
 United States Court of Appeals,
Eighth Circuit.
 Submitted May 13, 1996.
Decided Oct. 24, 1996.
Rehearing and Suggestion for Rehearing En Banc Denied Jan.
6, 1997.*
 
 John P. Guhin, Asst. Attorney General, argued, Pierre, S.D. (Roxanne Giedd, on the brief), for Third-Party Defendant-Appellant.
 James G. Abourezk, argued, Sioux Falls, S.D., for Plaintiffs-Appellees.
 Timothy R. Whalen, Charles Mix County States Attorney, Lake Andes, SD, Tom D. Tobin, Tobin Law Offices, P.C., Winner, SD, on the brief, for amicus curiae Charles Mix County.
 Before RICHARD S. ARNOLD, Chief Judge, and MAGILL and MURPHY, Circuit Judges.
 MURPHY, Circuit Judge.
 
 
 1
 This case raises questions about the extent to which an 1894 act of Congress affected the reservation of the Yankton Sioux Tribe in South Dakota. That statute ratified and incorporated an 1892 agreement between the tribe and the United States. The tribe brought this declaratory judgment action to enforce its claimed right to approve and regulate a landfill site over which the state claims jurisdiction on the basis that the 1894 statute disestablished or diminished the Yankton reservation. After a trial the district court[1] ruled that the site was still part of the Yankton reservation so federal environmental laws applied, but that the tribe did not have regulatory authority over the project, which it declined to enjoin. The state appealed from the judgment, and we affirm.
 
 I.
 
 2
 The Southern Missouri Waste Management District (Waste District) is a non-profit corporation which was established by several South Dakota counties to develop a regional solid waste landfill, for which it purchased land within the boundaries of Charles Mix County. The proposed site had been owned by a non-Indian but was within the Yankton Sioux Indian Reservation as defined by the 1858 treaty between the tribe and the United States.
 
 
 3
 The Waste District filed an application with the South Dakota Department of Environment and Natural Resources for a solid waste permit to construct the landfill on the site. The Yankton tribe was concerned about possible effects of the project, and it intervened and participated in the December 1993 administrative hearing on the permit application.
 
 
 4
 After the state granted the permit, the tribe[2] sued the Waste District in federal court to stop construction until it could review and regulate the project. It sought a declaratory judgment that the boundaries established in the 1858 treaty still define the extent of the reservation. The Waste District joined the state as a third party defendant, and the state argued that the tribe had no jurisdictional authority over the 200,000 noncontiguous acres ceded to the United States in 1894.
 
 
 5
 The case was tried to the court over five days. The tribe's expert on Yankton Sioux history, Professor Herbert Hoover, testified that his research revealed no historical reason to believe the boundaries of the reservation had been changed by the 1894 act. Several witnesses testified for each side as to the potential impact of the landfill on tribal activities, the political organization and history of the tribe, and their perception of the reservation's boundaries. Much of the trial focused on technical issues relating to the construction and integrity of the landfill.
 
 
 6
 After considering post-trial briefing by the parties which focused on the legal significance of a savings clause in the 1892 agreement, the district court entered a declaratory judgment. It concluded that the 1894 act ratifying the 1892 agreement did not disestablish or diminish the size of the reservation. Yankton Sioux Tribe v. Southern Missouri Waste Management District, 890 F.Supp. 878, 891 (D.S.D.1995). The landfill site was therefore still part of the reservation, and regulations of the Environmental Protection Agency (EPA) applied, including the requirement that a synthetic liner be installed in each of the landfill cells to prevent leakage.[3] The court also concluded that the tribe had not shown a right to regulate the landfill site since it had not established either exception to the general rule that Indian tribes cannot regulate the activities of non-Indians, even on a reservation. Montana v. United States, 450 U.S. 544, 564-66, 101 S.Ct. 1245, 1257-59, 67 L.Ed.2d 493 (1981); see also, A-1 Contractors v. Strate, 76 F.3d 930 (8th Cir.1996) (en banc), cert. granted, --- U.S. ----, 117 S.Ct. 37, 135 L.Ed.2d 1128 (1996) (matters affecting tribal self-government and consensual relations with the tribe are excepted). The court also declined to enjoin the landfill project so long as it complied with the EPA liner requirement.
 
 
 7
 On appeal South Dakota argues that the district court erred as a matter of law in concluding that the 1858 tribal boundaries remain in effect despite the 1892 agreement, its ratification in 1894, and the subsequent sale of unallotted land. It contends that the language of the agreement, its ratifying statute, and surrounding circumstances show that Congress intended that the boundaries established by the treaty of 1858 be disestablished or diminished.[4] The tribe responds that the intent and interest of Congress was in purchasing land for resale to non-Indian settlers, not in eliminating tribal authority in the area reserved in the treaty of 1858.[5]
 
 II.
 
 8
 In the 1858 treaty between the Yankton Sioux and the United States the tribe surrendered over 11 million acres, and the United States in turn agreed "[t]o protect the said Yanctons [sic] in the quiet and peaceable possession" of a 430,000 acre reservation in southern South Dakota and a much smaller reservation in southwestern Minnesota.[6] 11 Stat. 743. The tribe also received $1.6 million to be paid in annuities over 50 years, as well as funds for a mill, schools, houses, and other expenses related to establishing the reservation.
 
 
 9
 The decades following the signing of the treaty brought significant changes in federal Indian policy as more settlers moved westward, increasing the demand for places to homestead. Solem v. Bartlett, 465 U.S. 463, 466 & n. 6, 104 S.Ct. 1161, 1163-64 & n. 6, 79 L.Ed.2d 443 (1984). Congress was also confronted with how to deal with tribes whose reservations had once been isolated but were located in areas in which states were then being formed.
 
 
 10
 In 1887 Congress passed the General Allotment Act (Dawes Act). 24 Stat. 388 (1887), codified at 25 U.S.C. § 331 et seq. The Dawes Act permitted the federal government to allot plots of reservation land to individual Indians. Once the members of a tribe had received their individual allotments ("allotted lands") from the government, the surplus land ("unallotted lands") could be sold to non-Indian settlers. It was the government's policy until the early 1900s to sell reservation lands to settlers only after negotiating an agreement with the relevant tribe.[7]
 
 
 11
 The Dawes Act was intended both to advance the "civilization" and welfare of Indians and to provide land for settlement. See DeCoteau, 420 U.S. at 432, 95 S.Ct. at 1087. Although it did not mandate the elimination of reservations, it was hoped that under the allotment policy Indians would benefit from individual ownership and responsibility, abandon their communal notions of property and social organization, and learn to farm from their non-Indian neighbors. Hagen v. Utah, 510 U.S. 399, 402-04, 114 S.Ct. 958, 961, 127 L.Ed.2d 252 (1994). Individual members of the Yankton tribe eventually received allotments totalling about 230,000 acres scattered throughout the reservation. Yankton Sioux Tribe v. United States, 224 Ct.Cl. 62, 623 F.2d 159 (1980).
 
 
 12
 By 1892 there was considerable pressure from settlers for more land in South Dakota, and a three member commission was appointed to negotiate with the Yankton Sioux about their unallotted lands. The commission was charged with reaching an agreement that would allow the United States to buy as much of the unallotted land as the tribe would sell. The record shows that some tribal members were interested in selling because of a severe drought and because of concerns for the elderly and infirm, the status of the Pipestone quarry in Minnesota, and compensation owed tribal members for their service in the United States Army. The government hoped that the new policy would help the Yankton Sioux assimilate. The Senate Committee on Indian Affairs reported that "close contact with the frugal, moral, and industrious people who will settle there will stimulate individual effort and make their progress much more rapid than heretofore." S.Rep. No. 196, 53d Cong., 2d Sess. 1 (1894).
 
 
 13
 The commission eventually succeeded in securing the signatures of a majority of the male members of the tribe in favor of sale of the unallotted lands. Under the agreement, dated December 31, 1892,[8] the federal government would pay $600,000 with interest for some 200,000 acres within the boundaries of the reservation that had been established by the treaty of 1858.[9] The government intended then to sell plots of this land to settlers.
 
 
 14
 The agreement of 1892 contained several key provisions. In Article I the tribe agreed to "cede, sell, relinquish, and convey" all its right and title to transferred land, but Article XVIII stated that "Nothing in this agreement shall be construed to abrogate the treaty of April 19th, 1858" and that all provisions of that treaty "shall be in full force and effect, the same as though this agreement had not been made...." Consistent with the Dawes Act, the agreement also stated that lands allotted to tribal members were to be trust lands of the United States for twenty-five years, rather than grants to the Indians in fee simple. Articles IV, IX.
 
 
 15
 Congress incorporated the agreement into the ratifying statute in 1894 which passed without significant amendment.[10] 28 Stat. 286, 319. President Cleveland opened the unallotted lands for settlement by proclamation on May 16, 1895.
 
 
 16
 Congressional policy later changed when it became clear in the first decades of the twentieth century that the allotment policy was failing. Solem, 465 U.S. at 468 n. 9, 104 S.Ct. at 1165 n. 9; Mattz v. Arnett, 412 U.S. 481, 496 n. 18, 93 S.Ct. 2245, 2254 n. 18, 37 L.Ed.2d 92 (1973). A significant number of Indians had not become self-sustaining farmers, and many allotments had been sold off when the allottees died. On the Yankton reservation for instance, only 100,000 of over 200,000 acres originally allotted remained in Indian hands by 1914. Perrin v. United States, 232 U.S. 478, 34 S.Ct. 387, 58 L.Ed. 691 (1914). Critics concluded that the policy of integration by means of allotment had resulted in even greater poverty for Indian people. See Felix Cohen, Handbook of Federal Indian Law 215-17 (1988 ed.)
 
 
 17
 Congress responded with the Indian Reorganization Act of 1934, 48 Stat. 984 (1934), codified as amended at 25 U.S.C. § 461 et seq., which once again placed primary emphasis on reservations in its Indian land policy. Id. Congress authorized the Secretary of the Interior to exchange lands held by Indians and non-Indians within each reservation in an attempt to consolidate tribal lands. Id. at § 463e. Nevertheless, the lands owned by Yankton Sioux tribal members remain scattered throughout the area of the 1858 reservation. Most of these lands are held in trust by the United States. Although the trust period was only to run twenty-five years, it was extended by executive order in 1920, Exec. Order April 16, 1920, and then apparently indefinitely by the Indian Reorganization Act in 1934. 48 Stat. 984, § 2.
 
 III.
 
 18
 Certain basic principles are part of the legal framework for the issues raised by the parties. Once a reservation is created by Congress through a ratified treaty or agreement, only Congress can reduce or eliminate it, and it must "clearly evince" its intent to do so. Solem, 465 U.S. at 470, 104 S.Ct. at 1166. Opening a reservation to settlement is not inconsistent with the preservation of existing boundaries, Id., and some agreements and treaties preserved reservation boundaries, see, e.g., Id.; Mattz v. Arnett, 412 U.S. 481, 93 S.Ct. 2245, 37 L.Ed.2d 92 (1973); Seymour v. Superintendent, 368 U.S. 351, 82 S.Ct. 424, 7 L.Ed.2d 346 (1962), while others caused them to be diminished. See, e.g., Hagen v. Utah, 510 U.S. 399, 114 S.Ct. 958, 127 L.Ed.2d 252 (1994); Rosebud Sioux Tribe v. Kneip, 430 U.S. 584, 97 S.Ct. 1361, 51 L.Ed.2d 660 (1977); DeCoteau v. District County Court, 420 U.S. 425, 95 S.Ct. 1082, 43 L.Ed.2d 300 (1975). Ambiguity at any point is to be resolved in favor of the Indians, and diminishment should not be found lightly. Hagen, 510 U.S. at 410-11, 114 S.Ct. at 965. Since federal policy towards Indians has changed over time, cases dealing with disestablishment and diminishment issues present difficult questions of statutory intent. Solem, 465 U.S. at 468, 104 S.Ct. at 1164-65; see also, Hagen, 510 U.S. at 425-27, 114 S.Ct. at 973 (Blackmun, J., dissenting).
 
 
 19
 Each agreement with Indian tribes is different and must be evaluated in light of all the circumstances. Hagen, 510 U.S. at 410-13, 114 S.Ct. at 965-66. The Supreme Court has devised a "fairly clean analytical structure" for diminishment cases; this requires consideration of the language of the statute and any agreement it incorporated, the historical context surrounding its passage, and how the land in question has been used since. Id. The parties disagree about the significance of some of the sections of the Yankton agreement and the historical evidence.
 
 A.
 
 20
 The most important factor in determining whether Congress intended to disestablish or diminish the Yankton reservation is the 1894 statute, which incorporated the text of the 1892 agreement. Id. at 410-11, 114 S.Ct. at 965. The state believes the language used to describe the conveyance in Articles I and II is particularly relevant, while the tribe focuses on the savings clause in Article XVIII. Each side claims that other sections in the agreement also support its respective position.
 
 
 21
 South Dakota argues that the language in Articles I and II of the 1892 agreement makes it clear that Congress intended to disestablish or diminish the Yankton reservation. The full text of Article I is:
 
 
 22
 The Yankton Tribe of Dakota or Sioux Indians hereby cede, sell, relinquish, and convey to the United States all their claim, right, title, and interest in and to all the unallotted lands within the limits of the reservation as set apart to said Indians [in the Treaty of 1858].
 
 
 23
 Article II provided that the tribe was to receive $600,000 for conveyance of the land.[11] The state argues that the Supreme Court has construed similar language as indicating congressional intent to diminish or disestablish reservations. DeCoteau, 420 U.S. at 445, 95 S.Ct. at 1093.
 
 
 24
 The tribe responds that the cession language in Article I alone is not controlling. It says that the savings clause in Article XVIII must be considered together with Articles I and II and that the negotiation and legislative histories show that the first two articles were not intended to reduce the size of the reservation.
 
 
 25
 This court reviewed almost identical language to that in Article I in United States v. Grey Bear, 828 F.2d 1286 (8th Cir.1987), vacated in part on other grounds on rehearing en banc, 863 F.2d 572 (8th Cir.1988), cert. denied, 493 U.S. 1047, 110 S.Ct. 846, 107 L.Ed.2d 840 (1990). In that case the Indians had agreed they would "for the consideration hereinafter named, ... hereby cede, surrender, grant, and convey to the United States all their claim, right, title, and interest" in their unallotted lands. Id. at 1290. The court concluded that the reservation had not been diminished because the agreement, "standing alone, does not evince a clear congressional intent to disestablish the Devils Lake Reservation." Id. In reaching this conclusion, the court followed the Supreme Court's practice of looking at a number of factors other than cession language to consider disestablishment issues, including surrounding circumstances such as whether there was a lump sum payment or express acknowledgement by the tribe that its reservation would be diminished. Id. at 1290 n. 5.
 
 
 26
 The state argues that the $600,000 sale price in Article II, in conjunction with the "cede, sell, relinquish, and convey" language in Article I, gives rise to "an almost insurmountable presumption" that Congress intended to diminish the reservation. Solem, 465 U.S. at 470-71, 104 S.Ct. at 1166. The tribe asserts that the history behind Article II suggests that the payment provision in this statute did not indicate intent to diminish the reservation.
 
 
 27
 Article II passed in the Senate without modification, but the House of Representatives amended the agreement to provide for payment to the tribe only as portions of the unallotted lands were sold to settlers. 53 Cong.Rec. 8268 (1894). Some believed it inappropriate for the government to make large cash payments when there was no guarantee that all land would be sold. Id. The House later withdrew its amendment apparently to avoid any charge of bad faith for changing the agreed terms. See id. at 8268-71. There was no discussion showing any understanding that a sum certain payment would express an intent that the reservation be diminished.
 
 
 28
 The commission negotiations indicated that both sides had been interested in seeing that unallotted lands were appraised and sold as individual plots to settlers. Tribal members believed they would receive a higher price if the lands were sold in this manner rather than as a whole to the government. See, e.g., Negotiations at 77. The instructions to the commission from the Commissioner of Indian Affairs, dated July 27, 1892, stated in part: "It is understood that some of these lands are very valuable and will be eagerly sought after. It is therefore suggested the agreement provide for their appraisement and sale to the highest bidder." The Yankton commissioners apparently believed, however, that the tribe would receive more money from a single sale directly to the government so they adopted the approach taken in Article II. See, e.g., S.Exec.Doc. No 27, 53d Cong., 2d Sess. at 68 (1894) ("Negotiations").
 
 
 29
 Although a lump sum payment can in some circumstances indicate congressional intent to diminish a reservation, see, e.g., DeCoteau, 420 U.S. at 447-448, 95 S.Ct. at 1094-95, the record in this case does not support that conclusion. The commission's instructions, the stated desires of the Indians, and the House debate all show that a sum certain price was included for reasons other than issues of jurisdiction and sovereignty.
 
 
 30
 In their briefs the signatories to the 1892 agreement state that Article XVIII has the strongest savings clause of any unallotted land sale agreement between a tribe and the government. It states:
 
 
 31
 Nothing in this agreement shall be construed to abrogate the treaty of April 19th, 1858, between the Yankton tribe of Sioux Indians and the United States. And after the signing of this agreement, and its ratification by Congress, all provisions of the said treaty of April 19th, 1858, shall be in full force and effect, the same as though this agreement had not been made, and the said Yankton Indians shall continue to receive their annuities under the said treaty of April 19th, 1858.
 
 
 32
 A number of savings clauses in other agreements also state that earlier agreements and treaties will "be in full force and effect," but none include such a strong phrase as "the same as though this agreement had not been made," and most include language explaining that prior treaties will remain in force so long as they are "not inconsistent" with the later agreement. See, e.g., Oregon Dept. of Fish and Wildlife v. Klamath Indian Tribe, 473 U.S. 753, 760-61, 105 S.Ct. 3420, 3425, 87 L.Ed.2d 542 (1985) ("nothing in this agreement shall be construed to deprive [the tribe] of any benefits to which they are entitled under existing treaties not inconsistent with the provisions of this agreement."); Rosebud Sioux Tribe v. Kneip, 430 U.S. 584, 623, 97 S.Ct. 1361, 1381, 51 L.Ed.2d 660 (1977) (Marshall, J., dissenting) (benefits of existing treaties and agreements continue unless "inconsistent with the provisions of this agreement."); United States v. Southern Ute Tribe or Band of Indians, 402 U.S. 159, 162, 91 S.Ct. 1336, 1338, 28 L.Ed.2d 695 (1971) (all treaty provisions "not altered by this agreement shall continue in force"); Dick v. United States, 208 U.S. 340, 352, 28 S.Ct. 399, 402-03, 52 L.Ed. 520 (1908) (treaty provisions "not inconsistent with the provisions of this agreement are hereby continued in full force and effect").
 
 
 33
 Article XVIII contains no similar limitation. It does not state that only consistent aspects of the earlier treaty are to continue. It states simply that the provisions of the 1858 treaty are to remain in effect regardless of the contents of the agreement, "as though this agreement had never been made."
 
 
 34
 The rules of statutory construction require that all clauses of an agreement be read together in a way that will make them consistent and give all parts force. Colautti v. Franklin, 439 U.S. 379, 392, 99 S.Ct. 675, 684, 58 L.Ed.2d 596 (1979). Article XVIII should be read together with the other sections of the 1892 agreement to see whether all parts can be interpreted consistently, and the unusually expansive language of Article XVIII suggests that other sections should be read narrowly to minimize any conflict with the 1858 treaty.
 
 
 35
 The state does not dispute the strength of the language of Article XVIII, but argues that the savings clause in this case was meant only to reassure the tribe that it would continue to receive annuities under the 1858 treaty.[12] Interpreting Article XVIII to cover more than annuities would render the 1892 agreement largely meaningless, it says. The treaty of 1858 required the United States to "protect the said Yanctons [sic] in the quiet and peaceable possession of the said tract of four hundred thousand acres of land so reserved for their future home." If their possession were intended to continue "in full force and effect" after the 1892 agreement, sale of the unallotted lands would conflict with that intent by terminating the possessory rights of Indians. Article XVIII should therefore be read as covering only annuities.
 
 
 36
 The record shows that the tribe had been concerned about its annuities during the negotiations, but many concerns of a more general nature were also expressed. One of these concerns was the failure of the United States to uphold its obligations under past treaties. See, e.g., Negotiations at 55, 57-58.
 
 
 37
 Article XVIII is written in broad language, stating in the first sentence that nothing in the agreement "shall be construed to abrogate" the 1858 treaty and in the second sentence that "all provisions" of that treaty shall continue "in full force and effect." Only the second independent clause of the second sentence mentions annuities. The interpretation proposed by the state would give effect to only one of the independent clauses in one of the sentences. Other agreements specifically protected Indian annuities, but they did not use broad language apparently encompassing all treaty provisions.[13] These other examples show Congress knew how to limit the reach of an annuities provision, but it did not enact that type of limited provision in Article XVIII. Giving effect to the plain language and all parts of the article leads to the conclusion that it covers more than annuities.
 
 
 38
 It is possible to give meaning to all sections of the 1894 statute by examining them to see if they can be fairly reconciled, as the Supreme Court has directed. Colautti, 439 U.S. at 392, 99 S.Ct. at 684. The key question in interpreting the 1894 statute and agreement is whether Congress intended that the tribe's governmental authority be transferred with the land sale. Amicus United States argues that the 1858 treaty gave the tribe governmental authority within the treaty boundaries and that Article XVIII requires that the agreement be read to preserve that right. Although the cession language in Articles I and II could be viewed as describing a transfer of tribal governmental authority as well as land, thereby changing the 1858 treaty boundaries, the narrower reading is that the 1894 act simply authorized the conveyance of real property. The Supreme Court has found the sale of lands to homesteaders not inconsistent with the preservation of existing reservation boundaries. Rosebud, 430 U.S. at 586, 97 S.Ct. at 1362-63. The Yankton treaty of 1858 acknowledged the authority of the tribe over the reservation, and Article XVIII of the 1894 statute indicated that as much of that treaty as possible was to be preserved. The narrower reading of Articles I and II gives consistent meaning to Article XVIII and the agreement as a whole.
 
 
 39
 This court has previously given effect to a savings clause in determining that the Fort Berthold reservation was not diminished. City of New Town v. United States, 454 F.2d 121 (8th Cir.1972). The savings clause in the agreement between the Three Affiliated Tribes and the United States read:
 
 
 40
 That nothing in this Act shall be construed to deprive said Indians of Fort Berthold Indian Reservation of any benefits under existing treaties or agreements not inconsistent with the provisions of this Act.
 
 
 41
 Id. at 125. The court concluded that opening the reservation to settlement was not inconsistent with maintaining existing reservation boundaries. Id. (citing Seymour v. Superintendent, 368 U.S. 351, 82 S.Ct. 424, 7 L.Ed.2d 346 (1962)). Although the state attacks the continued validity of New Town, it is consistent with subsequent Supreme Court precedent. See Duncan Energy, 27 F.3d at 1296-97; see also, United States v. Standish, 3 F.3d 1207 (8th Cir.1993). Article XVIII should be given due weight in interpreting the Yankton agreement just as in New Town.
 
 
 42
 Articles I, II, and XVIII may be read together to give meaning to them all, and we conclude that in combination they reveal an intent to preserve the 1858 reservation boundaries.[14] Moreover, to the extent there could be any ambiguity perceived in the statute, it would have to be resolved in favor of the tribe.[15] Hagen, 510 U.S. at 410-11, 114 S.Ct. at 965.
 
 
 43
 Several other articles in the agreement also have some relevance on the issue of congressional intent. For example, Article VIII reserves from sale to settlers "[s]uch part of the surplus lands hereby ceded and sold to the United States as may now be occupied by the United States for agency, schools, and other purposes ... until they are no longer required for such purposes." An almost identical clause was considered by a unanimous Supreme Court in Solem to show that Congress foresaw continuation of the reservation there. 465 U.S. at 474, 104 S.Ct. at 1168 ("It is difficult to imagine why Congress would have reserved lands for such purposes if it did not anticipate that the opened area would remain part of the reservation.").[16]
 
 
 44
 South Dakota suggests that Article XVII indicates that Congress intended to diminish the reservation. That article provided that no liquor should be sold or given away on either the lands ceded and sold to the United States or "upon any other lands within or comprising the reservations of the Yankton Sioux."[17] The district court found that this provision was included at the insistence of the Yankton Sioux, who were concerned that white saloons would attract tribal members "to the great injury of their people." 890 F.Supp. at 882. The state argues, however, that the inclusion of such a provision shows that the Indians knew that the unallotted lands would no longer be on reservation land after the sale. It cites Rosebud where the Supreme Court concluded that a similar clause in an agreement gave rise to an inference that Congress intended to diminish the Rosebud reservation in 1910. 430 U.S. at 613, 97 S.Ct. at 1376. A statute passed in July 1892 had outlawed the sale of intoxicants in Indian Country so it appeared the clause would not be needed in 1910 if the lands still were in Indian country. Act of July 23, 1892, 27 Stat. 260; Rosebud, 430 U.S. at 613, 97 S.Ct. at 1376.
 
 
 45
 The negotiations with the Yankton tribe were conducted shortly after the 1892 liquor act had passed, and there is no evidence that any party was aware of it at the time the agreement was negotiated. The Yankton agreement provided that the prohibition on liquor would continue forever, while the agreement in Rosebud was only for twenty-five years. The 1892 liquor statute would have ceased to apply if the Yankton reservation were eliminated at some future point, but the liquor provision the tribe insisted on would remain. Article XVII in the Yankton agreement is therefore not surplusage in the same manner as the liquor provision in Rosebud and is not inconsistent with an intent to preserve the 1858 boundaries. The presence of a similar alcohol clause was found not to demonstrate an intent to diminish in New Town. 454 F.2d at 127.
 
 
 46
 The state argues that one other provision in the statute ratifying the 1892 agreement supports a finding that the reservation was diminished. Congress added the provision that "the sixteenth and thirty-sixth section in each Congressional township ... shall be reserved for common-school purposes and be subject to the laws of the State of South Dakota." Similar language in the Rosebud agreement was interpreted as having been intended to conform to the enabling act which admitted North and South Dakota to the United States. 25 Stat. 679 (1889). Under that act, the sixteenth and thirty-sixth sections in each township were granted to the state for common schools, but permanent federal reservations were excepted. Id.; Rosebud, 430 U.S. at 599-600, 97 S.Ct. at 1369-70. The Supreme Court reasoned that by using the same provision in the Rosebud surplus land act as was used in the statehood act, Congress indicated its intent to diminish the Rosebud reservation. Id. at 600-01, 97 S.Ct. at 1370. South Dakota argues that the same reasoning should be applied here.
 
 
 47
 The rationale from Rosebud has considerably less force in this case, however, because the 1894 Yankton act makes the common school sections "subject to the laws of the State of South Dakota." If Congress had intended to diminish the Yankton reservation, those common school sections would have been subject to the laws of the state in any event and the grant of jurisdiction would have been unnecessary. The language is at least equally consistent with a reading that Congress wished to insure that the infrastructure would exist for common schools for all future residents of the assimilated area.
 
 
 48
 South Dakota argues that analysis of the statute and the agreement is unnecessary because certain federal and state cases should control the result here. Whether the Yankton reservation was diminished or disestablished has never been squarely litigated and decided in federal court, however.[18] The South Dakota cases were criminal prosecutions in which the tribe was not involved and do not show full development of the issues or the analytical approach required by the United States Supreme Court.[19] See Solem, 465 U.S. at 470, 104 S.Ct. at 1166. Moreover, the Supreme Court has indicated that federal courts are not necessarily bound by earlier state court conclusions about disestablishment issues.[20]
 
 
 49
 We conclude after examining the statutory language that Congress did not express in the 1894 act an intent to diminish or disestablish the reservation. Also relevant in the required analysis is review of the legislative history and the events near the time of its passage, Hagen, 510 U.S. at 410-11, 114 S.Ct. at 965, and we turn now to this review.
 
 B.
 
 50
 South Dakota contends that the legislative history indicates that the unallotted lands on the Yankton reservation were restored to the public domain and that this shows Congress intended to diminish the reservation. While "the existence of [public domain] language in the operative section of a surplus land Act indicates that the Act diminished the reservation," Hagen, 510 U.S. at 414, 114 S.Ct. at 967, there is no mention of restoring the land to the "public domain" in the 1894 act or the 1892 agreement. South Dakota claims that even though there is no public domain language in the act itself, comments on the House floor about returning reservation lands to the public domain suggest an intent to diminish the Yankton reservation. The tribe responds that the debate was inconclusive at best.
 
 
 51
 Comments in Congress can be evidence of an intent to diminish, see DeCoteau, 420 U.S. at 446, 95 S.Ct. at 1094, but the legislative history does not demonstrate such an intent here. Several surplus land sales were included in a single Indian appropriations bill in 1894, including land purchases from the Yankton Sioux, Nez Perce, Yuma, Alsea-Siletz, Coeur d'Alene, and Yakima reservations. 26 Stat. 286 (1894). South Dakota points to two instances where representatives mentioned the public domain. One stated that the various provisions in the agreements "change the methods of disposing of the lands that will become part of the public domain...." 53 Cong.Rec. 6425 (1895). A second commented that the unallotted lands opened by the various agreements "are not governed by the public land laws until they become segregated from the Indian lands and become in fact a part of our public domain." Id. at 6426. Both comments were made in the context of a debate about whether the lands were to be furnished to settlers at no cost under the Homestead Act.
 
 
 52
 The comments cited by the state were made in reference to a group of agreements with some half dozen tribes. The different agreements were all included in one appropriations bill, but Congress used varying enacting sections for each.[21] For example, two of the six mentioned the public domain in the enacting section. Another explicitly referred to the fact that a new boundary would have to be drawn. Floor comments about multiple agreements which differ in their distinctive language and negotiation histories are of less value in evaluating congressional intent about any individual agreement than comments dedicated to that agreement alone.
 
 
 53
 The history of the commission to the Yankton Sioux and its negotiations with the tribe also suggests that Congress did not intend to disestablish the reservation. The commission was instructed: "If [the Yankton Sioux] are unwilling to cede all the surplus land you will endeavor to obtain the relinquishment of such part thereof as they may be willing to part with."[22] These instructions are consistent with the mission to secure land for settlement and to expose the tribe to settlers. Had the intent been the elimination of the reservation, it would have been necessary that all surplus lands be purchased.
 
 
 54
 The state points to a number of passages from the negotiations between the commission and the tribe which it believes show that the reservation would be disestablished, but the statements are consistent with a simple sale of the surplus lands and do not necessarily imply a transfer of sovereignty. For example, one of the commissioners said to tribal members:
 
 
 55
 This reservation alone proclaims the old times and the old conditions. But even here the means of your former mode of life have vanquished [sic]. The tide of civilization is as resistless as the tide of the ocean, and you have no choice but to accept it and live according to its methods or be destroyed of it. To accept it requires the sale of these surplus lands and the opening of this reservation to white settlement.
 
 
 56
 Negotiations at 81. The commissioner talks of a "sale" of surplus lands and the "opening of this reservation," but makes no mention of reduction or elimination of boundaries or any surrender of jurisdiction.
 
 
 57
 In another passage relied on by the state, a commissioner stated:
 
 
 58
 The Great Father desires and seeks in this transaction the benefit of the tribe, and what you may receive in this matter will be for this tribe alone, to help elevate you to citizenship, and as soon as you become the equals and assistants of the white man in making the laws, to be near him and learn his ways, you will learn to farm, to do all kinds of business, to be citizens in the true sense of the word. It might be, after you have sold your lands, you could have this reservation organized as a separate county. If this could be done--I do not say it can--you could govern your own people in your own way, so long as you obeyed the laws of the State.
 
 
 59
 Negotiations at 48. This passage shows that possible future state jurisdiction over the Indians was contemplated, but it does not indicate when any such jurisdiction would attach and under what circumstances. The passage clearly appears to envision continuity of the reservation, with the possibility it could be transformed into a county at some later date.
 
 
 60
 The tribe argues that these comments are very weak when compared to statements made by, or to the Indians, in cases where diminishment was found. In Rosebud, for example, the tribe was specifically told that "[t]he cession of Gregory county ... will leave your reservation a compact, and almost square tract, and would leave your reservation about the size and area of Pine Ridge Reservation." 430 U.S. at 591-92, 97 S.Ct. at 1365-66. In Hagen, the tribe was informed:
 
 
 61
 You say that [the reservation boundary] line is very heavy and that the reservation is nailed down upon the border. That is very true as applying to the past many years and up to now, but congress has provided legislation which will pull up the nails which hold down that line and after next year there will be no boundary line to this reservation.
 
 
 62
 Hagen, 510 U.S. at 417, 114 S.Ct. at 968 (internal citations omitted). In DeCoteau, a spokesman for the tribe stated:
 
 
 63
 Now that South Dakota has come in as a state we have some one to go to, to right our wrongs. The Indians have taken their land in severalty. They are waiting for patents. The Indians are anxious to get patents. We are willing the surplus land should be sold. We don't expect to keep reservation. [sic]
 
 
 64
 DeCoteau, 420 U.S. at 433, 95 S.Ct. at 1087. The Indians on these three reservations were thus clearly aware that their reservations would be smaller after the sale of lands. Neither the commissioners nor the tribal members made like comments in this case.
 
 
 65
 The negotiations between the Yankton Indians and the commissioners sent to secure the sale of unallotted lands do not support a finding of diminishment. Despite a long series of negotiations, most of which were recorded and included in the commission's report to Congress, there is no statement that clearly indicates that Congress intended to change the reservation boundaries or remove tribal sovereignty over the opened areas. There are also no statements by members of the tribe that demonstrate an understanding that the reservation boundaries would change.
 
 
 66
 In addition to the history of the negotiations and the legislation, there is other evidence to examine which might indicate the contemporary understanding of the 1894 act. The tribe believes the most significant piece of contemporary evidence is in an 1896 statute passed by Congress. The statute began: "Be it enacted ... [t]hat all settlers who made settlement under the homestead laws upon lands in the Yankton Indian Reservation, in the State of South Dakota, during the year eighteen hundred and ninety-five are hereby granted leave of absence from such homestead for one year...." 29 Stat. 16 (Feb. 26, 1896) (emphasis added). Section 3 of the statute extends "the time for making final proof and payment for all lands located under the homestead laws of the United States upon any lands of any former Indian reservation in the State of South Dakota...." Id. (emphasis added).
 
 
 67
 Congress thus continued in 1896 to refer to the unallotted lands as being in the Yankton reservation, a year after President Cleveland had opened the reservation lands for settlement. South Dakota argues that the 1896 statutory reference is entitled to little weight because the Commissioner of Indian Affairs used the word "former" in a document included in the legislative history. In the statute itself, however, Congress used "former" in section 3 when referring to a number of unspecified reservations in South Dakota, but not when referring to the Yankton reservation in section 1.
 
 
 68
 The state argues that other contemporaneous evidence indicates that the reservation was diminished. For example, it points to several statements by the Commissioner of Indian Affairs as being particularly relevant. Shortly after passage of the 1894 act, the commissioner stated that the Yankton agreement in 1892 and two others would result in a significant amount of land being "restored to the public domain." Annual Report of the Commissioner of Indian Affairs 26 (1894). Two years later the commissioner referred to the "former" Yankton reservation. H.R.Rep. No. 100, 54th Cong., 1st Sess. at 2 (1896). These appear to be isolated references, however. The tribe's Yankton Sioux history expert testimony at trial was unrefuted that in the many thousands of documents he had read regarding the reservation, references to the former reservation or lands originally within the reservation were infrequent.
 
 
 69
 South Dakota also states that it began exercising jurisdiction over the areas no longer held in trust by the United States shortly after the lands were opened. An 1895 criminal case, State v. Andrew War, First Judicial Circuit Court, Charles Mix County, supports this claim, as do several other cases cited by the state. The exercise of jurisdiction by a state over opened lands can be an indication of congressional intent, but it is not dispositive. See Solem, 465 U.S. at 472, 104 S.Ct. at 1167.
 
 
 70
 Some other evidence is simply inconclusive. Both sides introduced a number of maps, many of them from within several years of the opening of the lands. These maps ultimately prove little except that there was some confusion both inside and outside the government as to the status of the reservation. The General Land Office of the Department of the Interior showed the reservation with only a dotted line on a 1901 map. The legend did not specify what a dotted line meant, but it is not the demarcation shown for a reservation. On the other hand the Bureau of Indian Affairs, also in the Interior Department, continued to show the outline of the reservation on its maps. The type of outline used was identified in the legend to signify an Indian reservation, but the Yankton reservation was left unshaded while some other reservations were shaded. Study of the pattern of shading on these maps suggests that reservations opened to settlement were left unshaded. Because of these conflicting treatments and because an opened reservation is not necessarily diminished, these and similar maps are not particularly helpful.
 
 
 71
 Commercial maps have also differed. For example, The Atlas of Charles Mix County, South Dakota, published in 1906, does not appear to show the reservation. Exh. 631. A very detailed map of South Dakota in one 1895 atlas does show it. Rand McNally World Atlas 277 (1895). The confusion is perhaps best exemplified by Andrees' Hand Atlas, published in Germany. In both the 1899 and 1904 editions of the German atlas, a map of the United States shows the reservation (pages 160-61 in both editions), while a regional map on the next plate does not (pages 162-63).
 
 
 72
 These examples of confusion about the status of the lands are not enough to show that Congress expressly intended to diminish the reservation, and the 1896 statute is more probative of congressional intent than this more attenuated evidence. The statute is a statement by Congress itself and should guide the appraisal of the contemporaneous evidence. It suggests that Congress did not intend to diminish the Yankton reservation.
 
 IV.
 A.
 
 73
 The pattern throughout the twentieth century is similar to the contemporaneous evidence. Congress has continued to refer to the reservation as a continuing entity, but the treatment by other governmental bodies is mixed. Although less persuasive than evidence from the time surrounding an act's passage, later evidence is still relevant. Hagen, 510 U.S. at 410-11, 114 S.Ct. at 965.
 
 
 74
 Congress has repeatedly referred to the Yankton Reservation as ongoing. In 1920, for example, Congress provided "[t]hat the Secretary of the Interior be ... authorized and directed to convey to the trustees of the Yankton Agency Presbyterian Church, by patent in fee, the following-described premises situate [sic] within the Yankton Indian Reservation, county of Charles Mix, State of South Dakota." 41 Stat. 1468 (1920) (emphasis added). In 1932, Congress divided the United States District Court for the District of South Dakota into four divisions. "The territory embraced ... in the counties of Aurora, Beadle, ... Charles Mix, ... Yankton, and in the Yankton Indian Reservation, shall constitute the southern division of said district." 47 Stat. 300 (1932) (emphasis added). More recently, a water project approved by Congress will "irrigate not more than approximately three thousand acres of Indian-owned land in the Yankton-Sioux Indian Reservation...." Reclamation Projects Authorization and Adjustment Act of 1992, Pub.L. No. 102-575 § 2005(b) (1992) (emphasis added).
 
 
 75
 The state has not directed the court to a single enactment of Congress in which a reference was made to indicate the reservation had been diminished. The statutory references demonstrate that Congress believes the Yankton reservation continues to exist.
 
 
 76
 The executive branch has been less consistent, but there is considerable evidence from it in support of an undiminished reservation. In its brief the tribe points to testimony before Congress by the superintendent of the Yankton Agency in 1914 that the reservation was "[a]bout 26 by 35 or 36 miles," the area encompassed by the 1858 boundaries. In 1916, President Woodrow Wilson ordered "that the trust period on the allotments of Indians on the Yankton Sioux Reservation, South Dakota, which expires during the calendar years 1916 and 1919, be, and is hereby, extended for a period of ten years from dates of expiration, with the exception of the following...." (Exec.Order April 20, 1916).
 
 
 77
 Perhaps the foremost authority on federal Indian law, Felix Cohen wrote an opinion in 1941 while he was Acting Solicitor of the Department of the Interior that concluded the reservation was intact. It read in part:
 
 
 78
 The circumstances which influenced the Indian Office decision [that the reservation had been diminished] are the large amount of reservation land which has been fee patented and the existence of towns within the reservation. These circumstances may be persuasive in reaching an administrative conclusion, but I cannot agree with the conclusion as a matter of law.
 
 
 79
 The agreement of 1892 provided for the sale of such lands within the reservation as were not allotted or used for designated purposes. It did not provide for the sale of a particular designated part of the reservation. The act should be distinguished from other cession acts which ceded a definite part of the reservation and treated the remaining area as a diminished reservation. The lands allotted on the Yankton Reservation were scattered over all the reservation.... Since the 1892 agreement there has been no redefinition by Congress of the Yankton Reservation nor determination that the reservation no longer exists. On the contrary, the reservation was referred to as a still existing unit in the acts of April 29, 1920 (41 Stat. 1468) and June 11, 1932 (47 Stat. 300).
 
 
 80
 Letter of August 7, 1941, Opinions of the Solicitor, Department of the Interior 1063 (1979).
 
 
 81
 Others within the executive branch have taken varying positions. In 1969 an Associate Solicitor wrote that "the effect of the 1894 Act was to eliminate reservation boundaries and terminate the tribe's authority to establish a tribal court." Memorandum M-36783 from Associate Solicitor, Indian Affairs, to Commissioner of Indian Affairs, 1 (September 10, 1969).[23] An employee of the Bureau of Indian Affairs in its Aberdeen, South Dakota office testified at trial that his office considers the 1858 boundaries to be intact, and the 1990 census includes figures for the "Yankton Reservation" as defined by the 1858 boundaries. See, e.g., Bureau of the Census, U.S. Dep't of Commerce, Pub. No. 1990 CPH-1-43, Summary Population and Housing Characteristics--South Dakota 175 (1991). The United States as amicus in this case (and also a party to the treaty of 1858 and the 1892 agreement) argues that "the 1892 Agreement, as ratified by Congress, did not diminish or disestablish the exterior boundaries of the Yankton Sioux Reservation."
 
 
 82
 The state government has quite consistently exercised various forms of governmental authority over the opened lands on the Yankton reservation. State courts have exercised criminal jurisdiction over Indians on nontrust lands without objection from the tribe until recently. See, e.g., supra note 19. The state has also exercised some civil jurisdiction, at least over divorces between tribal members. See, e.g., Redbird v. Redbird, First Judicial Circuit Court, Charles Mix County (1916). The state has also played a significant regulatory role in mining, underground storage tanks, agriculture, air emissions, solid and hazardous waste, and other environmental activities in the area. The county and municipalities employ law enforcement personnel and maintain over 500 miles of roads within the 1858 boundaries, while the Bureau of Indian Affairs maintains only 20 miles of roads.
 
 
 83
 The state's treatment of the reservation has not been uniform, however. Ronald Catlin, a state witness and an employee of the South Dakota Department of Game, Fish, and Parks recalled seeing a memorandum instructing state employees how to refer to the reservation. Catlin remembered that the memo was written by Governor William Janklow sometime between 1978 and 1986 and directed employees to refer only to the "former Yankton Sioux Reservation." A reasonable inference to be drawn is that at least some state employees had been referring to the reservation as if it still existed.
 
 
 84
 The state argues that the tribe itself has not asserted jurisdiction over the opened areas and that some documents indicate that tribal members believed that the reservation boundaries had been reduced. The tribe's 1932 constitution was silent on the issue of jurisdiction, but the amended 1962 constitution claimed jurisdiction over "all original Tribal lands now owned by the Tribe under the Treaty of 1858." The tribe presented no evidence that it has attempted until recently to exercise civil, regulatory, or criminal jurisdiction over nontrust lands. Undisputed evidence at trial indicated that the tribe's effectiveness at self-government has also varied considerably over time.
 
 
 85
 Modern maps and atlases seem to show the reservation as extending to the 1858 boundaries. See U.S. Department of Commerce, 1990 Census of Population: Social and Economic Characteristics, South Dakota G-6 (1993); U.S. Department of the Interior Bureau of Indian Affairs, Indian Land Areas (General) [map] (1987); National Geographic Historical Atlas of the United States, 47 (Centennial Edition 1988) (see also, loose map entitled "Northern Plains" included with the atlas); Waldman & Braun, Atlas of the North American Indian 196-97 (Facts on File Publications 1985).
 
 
 86
 Considering all of the evidence submitted by the parties and amici regarding the subsequent history of the reservation, we cannot say that the surrounding circumstances are "fully consistent with an intent to terminate the reservation, and inconsistent with any other purpose." See DeCoteau, 420 U.S. at 448, 95 S.Ct. at 1095.
 
 B.
 
 87
 South Dakota argues that "[t]he Supreme Court has decreed that even in a case where de jure diminishment may not have occurred, 'de facto' diminishment may nonetheless have occurred." The tribe and the United States respond that de facto diminishment has never been applied in the absence of congressional intent to diminish.
 
 
 88
 Solem contains the Supreme Court's most complete discussion of de facto diminishment. It recognized there that:
 
 
 89
 who actually moved onto opened reservation lands is also relevant to deciding whether a surplus land act diminished a reservation. Where non-Indian settlers flooded into the opened portion of a reservation and the area has long since lost its Indian character, we have acknowledged that de facto, if not de jure, diminishment may have occurred.
 
 
 90
 Solem, 465 U.S. at 471, 104 S.Ct. at 1166. South Dakota argues that this permits a finding of diminishment even in the absence of congressional intent.
 
 
 91
 The Court in Solem cautioned, however, that subsequent demographic data are only "one additional clue as to what Congress expected would happen once land on a particular reservation was opened to non-Indian settlers." Id. at 471-72, 104 S.Ct. at 1167.
 
 
 92
 When both an Act and its legislative history fail to provide substantial and compelling evidence of a congressional intention to diminish Indian lands, we are bound by our traditional solicitude for the Indian tribes to rule that diminishment did not take place and that the old reservation boundaries survived the opening.
 
 
 93
 Id. at 472, 104 S.Ct. at 1167. Subsequent demographic data and jurisdictional history regarding the opened lands may therefore be useful evidence of congressional intent, but cannot substitute for it.
 
 
 94
 The demographic facts related to the Yankton reservation are somewhat incomplete. Between 1890 and 1900, the population of Charles Mix County doubled, but it is not clear from the census data how many of those people settled on the open lands within the 1858 boundaries.[24] Of the 8,498 persons in the county in 1900, 1,483 were Indians. Assuming that people were distributed evenly throughout the county (which is not clear from the record), roughly 4,000 people would have lived within the 1858 boundaries. The Indian population would have made up about 40 percent of the reservation.
 
 
 95
 Demographic shifts that happen soon after an act is passed would appear to be stronger evidence of congressional intent than later population changes because those closer in time might have been better anticipated by Congress. The contemporaneous evidence suggests that the area did not lose its "Indian character," see Solem, 465 U.S. at 471, 104 S.Ct. at 1166, because more than 53 percent of the land was allotted to tribal members who composed at least 40 percent of the population. After 1900 the Indian population apparently declined somewhat. Southern Missouri, 890 F.Supp. at 887.
 
 
 96
 There is some dispute in the record about precisely how many Yankton Sioux now live within the 1858 boundaries. According to the 1990 census, there were 1,994 American Indians and 4,275 non-Indians living on the "Yankton Reservation," which the Census Bureau defined as being within the 1858 boundaries.[25] Bureau of the Census, U.S. Dep't of Commerce, Pub. No.1990 CP-1-43, General Population Characteristics--South Dakota 29 (1992). The tribe claims that the census data do not accurately reflect the population of the area and that some 3,400 enrolled members of the tribe resided on the reservation as of 1993. These two sets of figures indicate that between 32 and 44 percent of the people within the 1858 boundaries are Indians.[26] (In contrast, the 1990 census reports that of the Indians living in Charles Mix County, only eight live outside the 1858 treaty boundaries.)
 
 
 97
 Finally, the evidence shows that the Indian population and influence in the area is increasing quite rapidly, a trend which appears likely to continue. The tribe opened the Fort Randall casino in 1991 which has provided both jobs and financial resources to tribal members and is apparently now the largest employer in Charles Mix County. The tribe has also announced its intention to use some of the casino proceeds to reacquire title to lands which have passed from Indian hands since 1894. Meanwhile the non-Indian population is decreasing.
 
 
 98
 The historical and demographic evidence does not show that Congress intended to change the 1858 boundaries. Only Congress can reduce or eliminate a reservation, see, e.g., Solem, 465 U.S. at 470, 104 S.Ct. at 1166, and it is "totally inappropriate" to rely only on de facto diminishment to reduce the size of a reservation. Duncan Energy, 27 F.3d 1294, 1298 (8th Cir.1994). The Yankton Sioux make up a significant portion of the population of the treaty area, and their numbers and economic influence are increasing. Thus, even if de facto diminishment were possible in spite of the lack of substantial evidence of congressional intent in the 1894 act and its legislative history, see Solem, 465 U.S. at 472, 104 S.Ct. at 1167, the record would not support it here.
 
 V.
 
 99
 In sum, application of the factors deemed relevant by the Supreme Court leads to the conclusion that Congress intended by its 1894 act that the Yankton Sioux sell their surplus land to the government, but not their governmental authority over it. Close examination of the agreement, the act, and the historical record does not reveal the "[s]ubstantial and compelling evidence of a congressional intention to diminish Indian lands" necessary for disestablishment or diminishment, but instead indicates the 1858 treaty boundaries were to be preserved. Solem, 465 U.S. at 472, 104 S.Ct. at 1167. The judgment of the district court is affirmed.
 
 
 100
 MAGILL, Circuit Judge, dissenting.
 
 
 101
 I believe that the district court erred in holding that the Yankton Sioux Reservation had not been diminished. See Yankton Sioux Tribe v. Southern Missouri Waste Management Dist., 890 F.Supp. 878, 879 (D.S.D.1995). The August 15, 1894 Act opening the Yankton Sioux Reservation to white settlement, an Act fulfilling treaty stipulations with and support of indian tribes, Ch. 290, 28 Stat. 314 (1894) (1894 Act), which ratified the 1892 agreement between the United States and the Yankton Sioux Tribe (1892 Agreement), contained language of cession of land for a sum certain, which created "an almost insurmountable presumption that Congress meant for the tribe's reservation to be diminished." Solem v. Bartlett, 465 U.S. 463, 470-71, 104 S.Ct. 1161, 1166, 79 L.Ed.2d 443 (1984) (citing DeCoteau v. District County Court, 420 U.S. 425, 447-48, 95 S.Ct. 1082, 1094-95, 43 L.Ed.2d 300 (1975)).[27] Because this presumption has not been rebutted in this case, I must respectfully dissent.
 
 I.
 
 102
 Although "the Congresses that passed the surplus land Acts anticipated the imminent demise of the reservation and, in fact, passed the Acts partially to facilitate the process," Solem, 465 U.S. at 468, 104 S.Ct. at 1165, we may not "extrapolate from this expectation a specific congressional purpose of diminishing reservations with the passage of every surplus land Act." Id. at 468-69, 104 S.Ct. at 1165. Instead, "some surplus land Acts diminished reservations," id. at 469, 104 S.Ct. at 1165, while "other surplus land Acts did not." Id. The United States Supreme Court, which has frequently addressed this issue,[28] has provided the proper analysis for determining if diminishment has occurred:
 
 
 103
 Our analysis of surplus land Acts requires that Congress clearly evince an intent to change boundaries before diminishment will be found. The most probative evidence of congressional intent is the statutory language used to open the Indian lands. Explicit reference to cession or other language evidencing the present and total surrender of all tribal interests strongly suggests that Congress meant to divest from the reservation all unallotted opened lands. When such language of cession is buttressed by an unconditional commitment from Congress to compensate the Indian tribe for its opened land, there is an almost insurmountable presumption that Congress meant for the tribe's reservation to be diminished.
 
 
 104
 Solem, 465 U.S. at 470-71, 104 S.Ct. at 1166 (citations and quotations omitted, emphasis added). In addition to creating this "almost insurmountable presumption" of diminishment, id. at 470, 104 S.Ct. at 1166, specific language of cession coupled with payment for a sum certain is an "extreme" example of Congress's express intent to diminish a reservation, see id. at 469 n. 10, 104 S.Ct. at 1165 n. 10, which is "precisely suited to disestablishment" purposes. Id. at 473 n. 15, 104 S.Ct. at 1167 n. 15 (quotations omitted). See also DeCoteau, 420 U.S. at 445, 95 S.Ct. at 1093 (express language of cession combined with payment of a sum certain "was precisely suited to this purpose" of terminating reservation).
 
 
 105
 The 1894 Act contained the following provisions:
 
 
 106
 Article I.
 
 
 107
 The Yankton tribe of Dakota or Sioux Indians hereby cede, sell, relinquish, and convey to the United States all their claim, right, title, and interest in and to all the unallotted lands within the limits of the reservation set apart to said Indians as aforesaid.Article II.
 
 
 108
 In consideration for the lands ceded, sold, relinquished, and conveyed to the United States as aforesaid, the United States stipulates and agrees to pay to the said Yankton tribe of Sioux Indians the sum of six hundred thousand dollars ($600,000), as hereinbefore provided for.
 
 
 109
 Ch. 290, 28 Stat. at 314-15 (emphasis added).
 
 
 110
 Because Articles I and II of the 1894 Act contain language of cession of land for a sum certain, they create an almost insurmountable presumption of diminishment. The task of this Court is therefore to determine if the proponents of a continued reservation status for the ceded lands have successfully rebutted this presumption of diminishment.[29] The majority, however, never makes this critical analysis. Indeed, the majority never acknowledges that the presumption of diminishment exists,[30] nor does it hold that the presumption of diminishment has somehow been rebutted.
 
 
 111
 Rather than addressing the presumption created by Articles I and II together, the majority considers each Article separately. Citing to United States v. Grey Bear, 828 F.2d 1286 (8th Cir.1987), vacated in part on other grounds on reh'g en banc, 863 F.2d 572 (8th Cir.1988), cert. denied, 493 U.S. 1047, 110 S.Ct. 846, 107 L.Ed.2d 840 (1990), which construed an allotment-era statute which contained a provision similar to Article I, the majority states that Article I's cession language "alone is not controlling." Maj. Op. at 1445. Unlike the instant case, however, Grey Bear did not involve an allotment-era statute which provided for a sum certain payment for ceded land. See Grey Bear, 828 F.2d at 1290. This lack of a sum certain payment was critical to this Court's analysis in Grey Bear, where we stated:
 
 
 112
 The Supreme Court has held that such explicit reference to cession suggests that Congress intended to divest the reservation of its land. See Solem, 465 U.S. at 470, 104 S.Ct. at 1166. The Court has further held that "[w]hen such language of cession is buttressed by an unconditional commitment from Congress to compensate the Indian tribe for its opened land, there is an almost insurmountable presumption that Congress meant for the tribe's reservation to be diminished." Id. at 470-71, 104 S.Ct. at 1166. We agree with the district court's analysis that although the "cede, surrender, grant, and convey" language of the Act suggests congressional intent to disestablish the reservation boundaries, see Rosebud, 430 U.S. at 597, 97 S.Ct. at 1368; DeCoteau, 420 U.S. at 445, 95 S.Ct. at 1093, the Act does not contain an unconditional commitment by Congress to pay the tribe for the ceded lands. [United States v. Grey Bear, 636 F.Supp. 1551, 1554 (D.N.D.1986) ]. Compensation for the lands was not set at any fixed price and the tribe was guaranteed reimbursement only for the lands actually disposed of by the government. Thus, the "almost insurmountable presumption" of disestablishment urged by defendants is not present in this case.
 
 
 113
 Id. at 1290 (emphasis in original). The 1894 Act does contain the critical language of an "unconditional commitment by Congress to pay the tribe for the ceded lands," id. (emphasis in original), and consequently places the instant case on an entirely different footing than Grey Bear. Rather than supporting the majority's decision to ignore the presumption of diminishment created by Articles I and II, therefore, Grey Bear strongly supports adhering to United States Supreme Court precedent.
 
 
 114
 The majority similarly discards the importance of Article II by asserting that "[a]lthough a lump sum payment can in some circumstances indicate a congressional intent to diminish a reservation, see, e.g., DeCoteau, 420 U.S. at 447-48, 95 S.Ct. at 1094-95, the record in this case does not support that conclusion." Maj. Op. at 1447. The majority fails to recognize that the language actually chosen by Congress is the best indication of its intent. See Citicasters v. McCaskill, 89 F.3d 1350, 1354-55 (8th Cir.1996) (citing cases). Rather than turning to the legislative history only to clarify an ambiguous statute, the majority seems to suggest that the plain meaning of a statute must be rejected unless positively supported by its legislative history. This approach is simply not correct. In Article II, Congress chose language "precisely suited" to diminishment, DeCoteau, 420 U.S. at 445, 95 S.Ct. at 1093, and the majority has pointed to nothing in the legislative history that betrays a contrary intent. See Maj. Op. at 1446-47 (discussing legislative history).
 
 
 115
 Without acknowledging the almost insurmountable presumption of diminishment created by the interplay of Articles I and II, the majority relies on the savings clause in Article XVIII to support its conclusion that the reservation was not diminished by the 1894 Act.[31] Article XVIII provides:
 
 
 116
 Nothing in this agreement shall be construed to abrogate the treaty of April 19th, 1858, between the Yankton tribe of Sioux Indians and the United States. And after the signing of this agreement, and its ratification by Congress, all provisions of the said treaty of April 19th, 1858, shall be in full force and effect, the same as though this agreement had not been made, and the said Yankton Indians shall continue to receive their annuities under the said treaty of April 19th, 1858.
 
 
 117
 Ch. 290, 28 Stat. at 318 (emphasis added). Disregarding that the cession of land for a sum certain provided by Articles I and II constitute an "extreme" example of Congress's express intent to diminish a reservation, see Solem, 465 U.S. at 469 n. 10, 104 S.Ct. at 1165 n. 10, which is "precisely suited to disestablishment" purposes, id. at 473 n. 15, 104 S.Ct. at 1167 n. 15 (quotations omitted), the majority states that "Articles I, II, and XVIII may be read together to give meaning to them all, and we conclude that in combination they reveal an intent to preserve the 1858 reservation boundaries." Maj. Op. at 1448 (note omitted). I disagree.
 
 
 118
 Based on the language of Article XVIII, legislative history, and the purpose of the 1894 Act, the only reasonable interpretation of Article XVIII is that it extended to annuities, and no farther. No one, including the district court, any party or amici, or the majority, suggests that we interpret Article XVIII literally, because to do so would eviscerate the 1894 Act, nullifying its chief provisions and contradicting its entire purpose.[32] Under the Act of April 19, 1858, 11 Stat. 743 (1858) (Treaty of 1858), the Yanktons were not to be dispossessed of their lands, and white settlers were not allowed within the 1858 boundaries of the reservation. The undisputed purpose of the 1894 Act, however, was to obtain Yankton land for white settlement; the 1894 Act specifically dispossessed the Yanktons of a substantial portion of their reservation and allowed white settlers to purchase them. The 1858 Treaty's provisions cannot be reconciled with the 1894 Act, and Article XVIII of the 1894 Act therefore cannot mean what it says. See Perry v. Commerce Loan Co., 383 U.S. 392, 400, 86 S.Ct. 852, 857, 15 L.Ed.2d 827 (1966) (" 'There is, of course, no more persuasive evidence of the purpose of a statute than the words by which the legislature undertook to give expression to its wishes. Often these words are sufficient in and of themselves to determine the purpose of the legislation. In such cases we have followed their plain meaning. When that meaning has led to absurd or futile results, however, this Court has looked beyond the words to the purpose of the act.' " (emphasis added) (quoting United States v. American Trucking Ass'ns, 310 U.S. 534, 543, 60 S.Ct. 1059, 1063-64, 84 L.Ed. 1345 (1940))); Armstrong Paint & Varnish Works v. Nu-Enamel Corp., 305 U.S. 315, 333, 59 S.Ct. 191, 200, 83 L.Ed. 195 (1938) ("to construe statutes so as to avoid results glaringly absurd, has long been a judicial function"). See also United States v. Granderson, 511 U.S. 39, ---- - ----, 114 S.Ct. 1259, 1268-69, 127 L.Ed.2d 611 (1994) (using "a sensible construction" to interpret a Sentencing Guideline "that avoids attributing to the legislature either an unjust or an absurd conclusion" (citations and quotations omitted)); Colautti v. Franklin, 439 U.S. 379, 392, 99 S.Ct. 675, 684, 58 L.Ed.2d 596 (1979) (describing "elementary canon of construction that a statute should be interpreted so as not to render one part inoperative").
 
 
 119
 Although a literal interpretation of Article XVIII is not possible without absurd results, it is still this Court's task to determine the intent of the 53rd Congress in crafting this provision of the 1894 Act. Determining the legislative intent of a bygone Congress is not a license to redraft poorly constructed legislation to achieve a result more in harmony with modern sensibilities, however, and the majority should have forsaken this opportunity to do so. Contrary to the majority's inventive interpretation of the savings clause, nowhere in Article XVIII nor in the legislative history of the 1894 Act is there any suggestion that the 1858 boundaries were to remain intact, nor that the tribe was to have continuing authority over ceded lands.[33] Rather, Article XVIII specifically reassured tribal members that annuities would continue, and the issue of annuities was of foremost importance in the negotiations for the cession of land. See, e.g., S.Exec.Doc. 27, 53rd Cong., 2d Sess. at 17-19 (Mar. 31, 1893 Report of the Yankton Indian Commission). Indeed, even historian Herbert Theodore Hoover, the Yankton tribe's expert witness, testified that, at the time of the negotiations preceding the 1894 Act, there existed
 
 
 120
 a rumor that [the Yanktons] believed that if they didn't sell the surplus land, the government of the United States was going to cut off their annuities.... So there was a belief in the tribe that it's plausible the government might shut these [annuities] down if we resist [selling land], because the resistance had led to the loss of annuities in the past. And one should not have the opinion that tribal members didn't communicate with each other, because Yanktons ran a lot with government support to hunt west of the Missouri River. So it's my opinion that the Yanktons would have believed that the government might cut off the annuities, and that would have been disastrous.... I believe that they believed that they were threatened by the loss of the annuities.
 
 
 121
 Trial Tr. at 53-55.
 
 
 122
 The majority's assertion that "Article XVIII of the 1894 statute indicated that as much of [the 1858] treaty as possible was to be preserved," Maj. Op. at 1448, is based neither on the text--which referred only to annuities--nor the legislative history of the 1894 Act, and has as its source only, as best as I can discern, a single-minded desire to avoid diminishment at all costs. Because Article XVIII extended only to annuities, it could not rebut the powerful presumption that the Yankton Sioux Reservation was diminished.
 
 II.
 
 123
 Other provisions of the 1894 Act are also relevant to a diminishment analysis. First, Article XVII of the 1894 Act prohibited the sale of liquor on the ceded lands. The inclusion of a liquor prohibition provision in an allotment statute is indicative of an intent to diminish the reservation, because standing law had already prohibited the introduction of alcohol into Indian country. See Rosebud, 430 U.S. at 613, 613-15 n. 47, 97 S.Ct. at 1376, 1376 n. 47. But see Solem, 465 U.S. at 475-76 n. 18, 104 S.Ct. at 1169 n. 18 (describing this provision as being "obviously of secondary importance to our decision" in the Rosebud case).[34] Second, Article VIII of the 1894 Act, which reserved parcels of ceded land for agency and school use, is similar to a provision the Solem Court found indicative of a continued reservation status. See 465 U.S. at 474, 104 S.Ct. at 1168. The Solem Court, however, did not consider what impact, if any, such a provision could have on the almost insurmountable presumption of diminishment created by Articles I and II.
 
 
 124
 Finally, the 1894 Act reserved the sixteenth and thirty-sixth sections in each "Congressional township" of the ceded lands for common schools, which were to "be subject to the laws of the State of South Dakota." Ch. 290, 28 Stat. at 319. A virtually identical provision in the statute opening the Rosebud Sioux Reservation was found by the Supreme Court to be strongly indicative of diminishment. See Rosebud, 430 U.S. at 599-601, 97 S.Ct. at 1369-70. The Court reasoned that the grant of land for common schools was based on § 10 of the Act of February 22, 1889, 25 Stat. 679 (admitting Act), which admitted North and South Dakota into the Union. The admitting Act provided that:
 
 
 125
 [U]pon the admission of each of said States into the Union sections numbered sixteen and thirty-six in every township of said proposed States ... are hereby granted to said States for the support of common schools ...: Provided, That the sixteenth and thirty-sixth sections embraced in permanent reservations for national purposes shall not, at any time, be subject to the grants ... of this act, nor shall any land embraced in Indian, military, or other reservations of any character be subject to the grants ... of this act until the reservation shall have been extinguished and such lands be restored to, and become a part of, the public domain.
 
 
 126
 Reprinted in Rosebud, 430 U.S. at 599-600, 97 S.Ct. at 1370 (emphasis added). The Rosebud Court reasoned that, because the admitting Act specifically excluded a grant of land in an Indian reservation until after the reservation had been extinguished, the congressional grant of land based on § 10 of the admitting Act necessarily implied that the Rosebud reservation had been diminished. See id. at 599-601, 97 S.Ct. at 1369-70. This precise logic applies in this case, as well: the grant of land for common schools in the 1894 Act--which contains the identical language as § 10 of the admitting Act--could not have been based on § 10 of the admitting Act if the Yankton reservation had not been diminished. This provision, therefore, strongly supports diminishment.[35]
 
 III.
 
 127
 The United States Supreme Court has found diminishment of a reservation even where Congress has not made its intent to diminish explicit by including language of cession of land for a sum certain in an allotment statute. In Solem, the Court stated that
 
 
 128
 explicit language of cession and unconditional compensation are not prerequisites for a finding of diminishment. When events surrounding the passage of a surplus land Act--particularly the manner in which the transaction was negotiated with the tribes involved and the tenor of legislative Reports presented to Congress--unequivocally reveal a widely held, contemporaneous understanding that the affected reservation would shrink as a result of the proposed legislation, we have been willing to infer that Congress shared the understanding that its action would diminish the reservation....
 
 
 129
 465 U.S. at 471, 104 S.Ct. at 1166 (citations omitted). The legislative history of the 1894 Act contains striking passages which clearly anticipated the termination of tribal governance; see, e.g., S.Exec.Doc. 27 at 19 ("and now that [the Yankton Indians] have been allotted their lands in severalty and have sold their surplus land--the last property bond which assisted to hold them together in their tribal interest and estate--their tribal interests may be considered a thing of the past") (Report of the Yankton Indian Commission, recommending that South Dakota be given funds to ensure access by Yankton Indians to state courts). See also id. at 48 ("It might be, after you sold your lands, you could have this reservation organized as a separate county. If this could be done--I do not say it can--you could govern your own people in your own way, so long as you obeyed the laws of the State.") (statements by government negotiator to Yankton tribal members, emphasis added).[36]
 
 
 130
 In addition, "events that occurred after the passage of a surplus land Act" may support a finding of diminishment. Solem, 465 U.S. at 471, 104 S.Ct. at 1166. These "events" include how "local judicial authorities dealt with unallotted open lands." Id.[37] In this case, the South Dakota Supreme Court has consistently held that the Yankton Sioux Reservation has been diminished. See, e.g., State v. Thompson, 355 N.W.2d 349 (S.D.1984); State v. Winckler, 260 N.W.2d 356 (S.D.1977); State v. Williamson, 87 S.D. 512, 211 N.W.2d 182 (1973); Wood v. Jameson, 81 S.D. 12, 130 N.W.2d 95 (1964).[38] While the Yankton tribe has not "exercised civil jurisdiction, particularly environmental regulation, over Indians or non-Indians beyond its trust lands," Yankton Sioux, 890 F.Supp. at 888, by contrast, "the State of South Dakota has exercised jurisdiction over mining, solid waste disposal, and hazardous materials on non-Indian lands located within the 1858 exterior boundaries of the Yankton Sioux Reservation." Id. Indeed, South Dakota has exercised civil and criminal jurisdiction over tribal members in the ceded lands for the past century. See id. at 887. Although this exercise of jurisdiction may not be dispositive, it substantially supports a finding of diminishment. See, e.g., Hagen, 510 U.S. at 421, 114 S.Ct. at 970 ("This 'jurisdictional history,' as well as the current population situation in the Uintah Valley, demonstrates a practical acknowledgement that the Reservation was diminished; a contrary conclusion would seriously disrupt the justifiable expectations of the people living in the area."); see also Rosebud, 430 U.S. at 604, 97 S.Ct. at 1372 ("[T]he fact that neither Congress nor the Department of Indian Affairs has sought to exercise its authority over this area, or to challenge the State's exercise of authority is a factor entitled to weight as a part of the 'jurisdictional history.' "); DeCoteau, 420 U.S. at 449, 95 S.Ct. at 1095 ("Until the Court of Appeals altered the status quo, South Dakota had exercised jurisdiction over the unallotted lands of the former reservation for some 80 years.").
 
 
 131
 Federal courts have also usually considered the Yankton reservation to have been diminished. In Perrin v. United States, 232 U.S. 478, 34 S.Ct. 387, 58 L.Ed. 691 (1914), a white merchant living on ceded lands within the boundaries of the 1858 Yankton reservation was convicted of selling alcohol, in violation of the 1894 Act and a related statute. The Court, after noting that "[t]he power of Congress to prohibit the introduction of intoxicating liquors into an Indian reservation ... does not admit of any doubt," id. at 482, 34 S.Ct. at 389, went on to analyze whether Congress had authority to regulate alcohol "upon ceded lands formerly included in the Yankton Sioux Indian Reservation." Id. at 480, 34 S.Ct. at 388. The Court referred to the "original reservation," id. at 486, 34 S.Ct. at 391, and quoted case law that "[i]f liquor is injurious to [Indians] inside of a reservation, it is equally so outside of it." Id. at 484, 34 S.Ct. at 390 (quoting United States v. Forty-Three Gallons of Whiskey, 93 U.S. 188, 195, 23 L.Ed. 846 (1876)). While not reaching a specific holding, the United States Supreme Court clearly treated the Yankton Sioux Reservation as diminished.[39] See also Weddell v. Meierhenry, 636 F.2d 211, 213 (8th Cir.1980) (noting that community within the 1858 boundaries of the reservation was not a "dependent Indian community") (denying habeas relief to Yankton tribal member convicted in the South Dakota state court for crimes committed on ceded lands), cert. denied, 451 U.S. 941, 101 S.Ct. 2024, 68 L.Ed.2d 329 (1981); Yankton Sioux Tribe v. United States, 224 Ct.Cl. 62, 623 F.2d 159, 165 (1980) ("These final boundaries of the Yankton Sioux Reservation were respected by both parties for more than three decades up until the 1892 Agreement changed those boundaries by the cession at issue in this case.") (awarding additional compensation for lands ceded by 1894 Act).
 
 IV.
 
 132
 Under the explicit terms of the 1894 Act and in light of controlling United States Supreme Court precedent, it is clear that the 53rd Congress intended to change the Yankton Sioux Reservation's boundaries and to remove tribal authority over lands ceded in the 1894 Act, and that the 1894 Act therefore diminished the Yankton Sioux Reservation. While I understand the majority's desire to "remake history," DeCoteau, 420 U.S. at 449, 95 S.Ct. at 1095, and to redraft legislation which has arguably had unfortunate results, see, e.g., Maj. Op. at 1444 (noting that "it became clear in the first decades of the twentieth century that the allotment policy was failing"), its rejection of clear congressional intent and its disregard of controlling and contrary Supreme Court precedent cannot be condoned. I respectfully dissent.
 
 
 
 *
 Judge Bowman, Judge Magill, and Judge Loken would grant the suggestion. Judge Wollman took no part in the consideration or decision of this case
 
 
 [1]
 The Honorable Lawrence L. Piersol, United States District Judge for the District of South Dakota
 
 
 [2]
 The tribe sued on behalf of itself and its individual members, one of whom, tribal chairman Darrell E. Drapeau, also sued individually (collectively referred to as "the tribe")
 The United States, the Flandreau Santee Tribe, and various descendants of two nineteenth century Yankton Sioux filed amicus briefs supporting the tribe on this appeal, and amicus Charles Mix County has supported the position of the state.
 
 
 [3]
 South Dakota had approved the project plan to use only a two foot compacted clay liner to contain the garbage. Since the EPA had granted authority to the state to approve projects within its jurisdiction, synthetic liners would not have been required if the site were not on the Yankton reservation
 
 
 [4]
 "Diminished" and "disestablished" seem to be used interchangeably in some cases. See, e.g., Rosebud Sioux Tribe v. Kneip, 430 U.S. 584, 97 S.Ct. 1361, 51 L.Ed.2d 660 (1977). "Disestablishment" appears to be more precisely used to describe the relatively rare elimination of a reservation, see, e.g., DeCoteau v. District County Court, 420 U.S. 425, 95 S.Ct. 1082, 43 L.Ed.2d 300 (1975), as opposed to reduction in the size of a reservation or "diminishment." See, e.g., Rosebud Sioux Tribe v. Kneip, 430 U.S. 584, 97 S.Ct. 1361, 51 L.Ed.2d 660 (1977)
 South Dakota uses both terms in stating its position without really distinguishing between them, but its core argument is that the 1894 act eliminated the reservation, leaving the tribe and federal government with jurisdiction only over remaining trust lands.
 
 
 [5]
 The tribe did not appeal the district court's denial of an injunction against the project or its conclusion that the tribe did not have regulatory authority over it
 
 
 [6]
 Evidence at trial disclosed that the Yankton Sioux had previously given up some 2 million acres in the 1830s and had historically been one of the most peaceful Indian tribes
 
 
 [7]
 In 1903 the Supreme Court ruled that Congress could unilaterally abrogate treaties with Indian tribes. Lone Wolf v. Hitchcock, 187 U.S. 553, 566, 23 S.Ct. 216, 221-22, 47 L.Ed. 299 (1903); see also Solem, 465 U.S. at 470 n. 11, 104 S.Ct. at 1166 n. 11
 
 
 [8]
 The required number of signatures was not obtained until several months after the date of the agreement
 
 
 [9]
 There is conflicting evidence in the record regarding the number of acres allotted to Indians and the number of unallotted acres sold to the United States. The Court of Claims later determined that roughly 230,000 acres were allotted to tribal members and some 200,000 unallotted acres were sold in 1894. Yankton Sioux Tribe, 623 F.2d at 174
 
 
 [10]
 The following are the relevant provisions Congress added to enact the agreement:
 Therefore, Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, That said agreement be, and the same hereby is, accepted, ratified, and confirmed.
 That for the purpose of carrying the provisions of this Act into effect there is hereby appropriated, out of any moneys in the Treasury not otherwise appropriated, the sum of six hundred thousand dollars, or so much thereof as may be necessary....
 That the lands by said agreement ceded, to the United States shall, upon proclamation by the President, be opened to settlement, and shall be subject to disposal only under the homestead and town-site laws of the United States, excepting the sixteenth and thirty-sixth sections in each Congressional township, which shall be reserved for common-school purposes and be subject to the laws of the State of South Dakota: Provided, That each settler on said lands shall ... pay to the United States ... three dollars and seventy-five cents per acre....
 
 
 [11]
 Article II read:
 In consideration for the lands ceded, sold, relinquished, and conveyed to the United States as aforesaid, the United States stipulates and agrees to pay to the said Yankton tribe of Sioux Indians the sum of six hundred thousand dollars ($600,000) as hereinbefore provided for.
 The act also provided for a twenty dollar gold piece for each male adult member of the tribe, payment of monies due some tribal members for services as Army scouts in the 1860s, and various other forms of support.
 
 
 [12]
 The state believes that clauses such as Article XVIII should not play any role in the statutory analysis because the Rosebud majority did not discuss them. There may be various reasons why they were not discussed, but the Rosebud clauses were significantly weaker than the Yankton savings clause. For example, one representative provision read:
 Each Act states, in almost identical terms, that "nothing in this 'agreement shall be construed to deprive the ... Indians of the Rosebud Reservation, South Dakota, of any benefits to which they are entitled under existing treaties or agreements, not inconsistent with the provisions of this agreement.' "
 430 U.S. at 623, 97 S.Ct. at 1381 (Marshall, J., dissenting). Not only do the Rosebud provisions contain the "not inconsistent" language absent in Article XVIII, but they also focus on benefits rather than "all provisions" of a specific treaty.
 Savings clauses were noted in other Supreme Court cases but not explicitly considered. See Klamath, 473 U.S. 753, 105 S.Ct. 3420; Chippewa Indians of Minnesota v. United States, 301 U.S. 358, 57 S.Ct. 826, 81 L.Ed. 1156 (1937); Shoshone Tribe of Indians v. United States, 299 U.S. 476, 57 S.Ct. 244, 81 L.Ed. 360 (1937).
 
 
 [13]
 See, e.g., Shoshone Tribe v. United States, 299 U.S. 476, 489, 57 S.Ct. 244, 248, 81 L.Ed. 360 (1937) ("Nothing in this agreement shall be construed to deprive the Indians of any annuities or benefits to which they are entitled under existing agreements or treaty stipulations.")
 
 
 [14]
 The Supreme Court has suggested that the jurisdictional pattern that results from a conclusion of diminishment or disestablishment may also be used to indicate what Congress had in mind. Where there is a "checkerboard pattern" of Indian trust land scattered over an area and a finding of disestablishment would terminate the entire reservation, it is less likely that Congress intended to change the boundaries. Rosebud, 430 U.S. at 598 n. 20, 97 S.Ct. at 1369 n. 20. Checkerboard jurisdictional arrangements are generally disfavored by both Congress and the courts. See Moe v. Confederated Salish and Kootenai Tribes, 425 U.S. 463, 478, 96 S.Ct. 1634, 1643-44, 48 L.Ed.2d 96 (1976); Seymour, 368 U.S. at 358, 82 S.Ct. at 428-29; United States v. Long Elk, 565 F.2d 1032, 1039 (8th Cir.1977)
 A checkerboard pattern of jurisdiction would have been the result if the Yankton reservation had been diminished by the 1894 act. The Yankton Sioux retained the majority of the land within the 1858 boundaries (more than was retained by the Cheyenne River Sioux on their undiminished reservation). Solem, 465 U.S. at 464, 466 n. 6, 104 S.Ct. at 1162-63, 1164 n. 6. These facts distinguish this case from DeCoteau where Congress must have known it was creating an area composed mostly of non-Indian settlers. 420 U.S. at 435 n. 16, 95 S.Ct. at 1088 n. 16.
 
 
 [15]
 The preamble to the 1892 agreement contains language that may be relevant to ascertain congressional intent. The entire agreement, including the preamble, was incorporated into the ratifying statute in 1894. The preamble stated that the Yankton tribe was "willing to dispose of a portion of the land set apart and reserved to said tribe." The Supreme Court has concluded that the phrase "sell and dispose" indicates congressional intent to maintain existing reservation boundaries. Solem, 465 U.S. at 472-474, 104 S.Ct. at 1167-68; see also Duncan Energy Co. v. Three Affiliated Tribes, 27 F.3d 1294, 1297 (8th Cir.1994), cert. denied, 513 U.S. 1103, 115 S.Ct. 779, 130 L.Ed.2d 673 (1995). Where there is a potential conflict between sections of the statute, the preamble can be used to understand the intent of Congress. Jurgensen v. Fairfax County, 745 F.2d 868, 885 (4th Cir.1984)
 
 
 [16]
 Article VIII also appears to refute the argument that diminishment is indicated by the failure of the agreement to reserve land for the tribe's use. Evidence at trial indicated that the tribe had expected government of the reservation to continue through the Greenwood agency so no land needed to be reserved for that purpose. The reservation of agency land in Article VIII is consistent with an expectation on the part of the tribe that the reservation would continue as before. As in Solem, the United States has continued to hold lands in trust for the Yankton Sioux, and the day that federal services to the Yankton Sioux would be unnecessary has not yet come
 
 
 [17]
 The full text of the article reads:
 No intoxicating liquors nor other intoxicants shall ever be sold or given away upon any of the lands by this agreement ceded and sold to the United States, nor upon any other lands within or comprising the reservations of the Yankton Sioux or Dakota Indians as described in the treaty between the said Indians and the United States, date April 19th, 1858, and as afterwards surveyed and set off to the said Indians. The penalty for the violation of this provision shall be such as Congress may prescribe in the act ratifying this agreement.
 
 
 [18]
 The state claims that the Supreme Court established in Perrin v. United States, 232 U.S. 478, 34 S.Ct. 387, 58 L.Ed. 691 (1914), that the reservation was diminished by the 1894 act. In Perrin the Court concluded that Congress had authority to criminalize liquor sales on lands ceded by tribes and upheld a conviction for sales made within the 1858 Yankton treaty boundaries. The argument of the United States in Perrin focused on the plenary authority of Congress with regard to Indians and on the perpetual nature of the liquor ban; it did not claim that the town where Perrin sold liquor was still on reservation land. There was no discussion of diminishment
 In Weddell v. Meierhenry, 636 F.2d 211 (8th Cir.1980), cert. denied, 451 U.S. 941, 101 S.Ct. 2024, 68 L.Ed.2d 329 (1981), an Indian arrested in Wagner, South Dakota, which is within the 1858 boundaries, was convicted in state court and claimed he was entitled to habeas relief because his crime was committed in Indian Country. Diminishment was not litigated, and the court specifically noted that neither party raised the issue. Id. at 213 n. 2.
 In Yankton Sioux Tribe v. United States, 224 Ct.Cl. 62, 623 F.2d 159 (1980), the Yankton tribe sought and received an award from the United States because, among other things, the $600,000 price fixed by the 1892 agreement was alleged to have been unconscionably low. The focus of the case was on the fair market value of the unallotted lands sold by the tribe, and comments the court made related to diminishment were dicta.
 
 
 [19]
 The South Dakota Supreme Court has concluded that the Yankton reservation was diminished by the 1894 act, see State v. Thompson, 355 N.W.2d 349 (S.D.1984); State v. Williamson, 87 S.D. 512, 211 N.W.2d 182 (1973); Wood v. Jameson, 81 S.D. 12, 130 N.W.2d 95 (1964), but it appears that the issues regarding diminishment were not fully presented to the court. The cases do not address the legislative history or the surrounding circumstances of the 1894 act or the savings clause in Article XVIII. They rely almost exclusively on the language of Articles I and II
 
 
 [20]
 The United States Supreme Court granted certiorari after an Eighth Circuit decision, Bartlett v. Solem, 691 F.2d 420 (8th Cir.1982), concluded that the Cheyenne River Reservation had not been diminished. Bartlett was in conflict with two South Dakota Supreme Court cases (State v. Janis, 317 N.W.2d 133 (S.D.1982); Stankey v. Waddell, 256 N.W.2d 117 (S.D.1977)). The Court affirmed the Eighth Circuit decision in Solem. 465 U.S. at 466, 104 S.Ct. at 1163-64
 
 
 [21]
 At least one of the reservations under discussion has been found not to have been diminished. Ute Indian Tribe v. State of Utah, 773 F.2d 1087, 1090-93 (10th Cir.1985) (en banc), cert. denied, 479 U.S. 994, 107 S.Ct. 596, 93 L.Ed.2d 596 (1986). The Tenth Circuit concluded that the "surrounding events concerning the 1894 and 1897 Acts are ambiguous." Id. at 1093
 
 
 [22]
 The October 11, 1995 motion of South Dakota to enlarge the record with the instructions from the Commissioner of Indian Affairs to the Yankton commission is granted
 
 
 [23]
 The parties introduced scores of documents to show how the reservation has been treated. Only representative samples are discussed here; others were addressed in the district court's opinion
 
 
 [24]
 There is an additional source of uncertainty in these data. South Dakota points out that the Census Bureau did not provide a separate category for the Yankton reservation in the 1900 census. It is therefore possible that almost half of the increase in population during this decade can be attributed to adding the Yankton Sioux population in with the non-Indians
 
 
 [25]
 South Dakota points out that the United States holds in trust for Indians some 37,000 acres within the 1858 boundaries. This is less than ten percent of the total number of acres. Property ownership appears to be an unreliable indicator of the character of the area, however, because census data from 1990 reveal that almost two-thirds of the Indian households on the reservation rent their homes
 
 
 [26]
 Even if the lower 32 percent figure is used for the Indian population in the old treaty area, it is much higher than that of the Lake Traverse Indian Reservation which the Supreme Court found had been disestablished in DeCoteau. On that reservation, only 3,000 of 33,000, or nine percent, of the people within the original treaty boundaries were Indians. DeCoteau, 420 U.S. at 428, 95 S.Ct. at 1084-85
 
 
 [27]
 The boundaries of the Yankton Sioux Reservation were established by a treaty between the United States and the Yankton Sioux Tribe in 1858. See Act of April 19, 1858, 11 Stat. 743 (1858) (Treaty of 1858)
 
 
 [28]
 In addition to Solem and DeCoteau, the Supreme Court has considered the issue of diminishment in Hagen v. Utah, 510 U.S. 399, 114 S.Ct. 958, 127 L.Ed.2d 252 (1994), Rosebud Sioux Tribe v. Kneip, 430 U.S. 584, 97 S.Ct. 1361, 51 L.Ed.2d 660 (1977), Mattz v. Arnett, 412 U.S. 481, 93 S.Ct. 2245, 37 L.Ed.2d 92 (1973), and Seymour v. Superintendent, 368 U.S. 351, 82 S.Ct. 424, 7 L.Ed.2d 346 (1962). In Hagen, Rosebud, and DeCoteau, the Court found diminishment based on an allotment-era statute
 
 
 [29]
 Although the United States Supreme Court has never found that this presumption of diminishment has been rebutted, its choice of the phrase, "almost insurmountable presumption," Solem, 465 U.S. at 470, 104 S.Ct. at 1166 (emphasis added), suggests it is at least theoretically possible, although difficult, to rebut this presumption of diminishment. The Court has not, however, enunciated what quanta of evidence is necessary to achieve this feat. Because an "almost insurmountable presumption" is obviously not to be lightly discarded, it would seem that one challenging it should have the burden of presenting evidence which, at a minimum, clearly and convincingly demonstrates that Congress intended to maintain tribal governance over ceded lands despite its enactment of provisions precisely suited to diminishment
 
 
 [30]
 While the majority makes two passing references to this critical presumption, it couches each reference as a mere restatement of the appellant's argument. See Maj. Op. at 1446 ("The state argues that the Supreme Court has construed similar language [as that in Articles I and II] as indicating congressional intent to diminish or disestablish reservations. DeCoteau, 420 U.S. at 445, 95 S.Ct. at 1093."); id. at 1446 ("The state argues that the $600,000 sale price in Article II, in conjunction with the 'cede, sell, relinquish, and convey' language in Article I, gives rise to 'an almost insurmountable presumption' that Congress intended to diminish the reservation. Solem, 465 U.S. at 470-71, 104 S.Ct. at 1166."). Nowhere in its opinion does the majority acknowledge that the appellant is correct that this almost insurmountable presumption of diminishment was created by Articles I and II
 
 
 [31]
 The majority indicates that "[i]n their briefs the signatories to the 1892 agreement state that Article XVIII has the strongest savings clause of any unallotted land sale agreement between a tribe and the government." Maj. Op. at 1447. Assuming that this refers to the appellee and to amicus the United States, I am at a loss as to why the majority finds the assertions of these parties so significant; surely, the "strength" of a savings clause is a question of law for this Court to determine, and is independent of the parties' historical relationship to the legislation. To the extent that Article XVIII represents an unusual savings clause, however, I note that the United States Supreme Court found diminishment despite similarly "strong"--if less verbose--savings clauses in two other allotment-era statutes. In Montana v. United States, 450 U.S. 544, 548, 101 S.Ct. 1245, 1249, 67 L.Ed.2d 493 (1981), the Court concluded that 22 Stat. 42 reduced a reservation to 2.3 million acres, despite a savings clause that provided that "all the existing provisions of May seventh, eighteen hundred and sixty-eight, [establishing an 8,000,000 acre reservation] shall continue in force." An Act accepting and ratifying agreement for sale of a portion of the Crow Indians of Montana reservation, Ch. 74, 22 Stat. 42 (1882). Similarly, in DeCoteau, 420 U.S. at 446, 95 S.Ct. at 1094, the United States Supreme Court found diminishment despite a savings clause in an allotment-era statute which provided that an earlier treaty's provisions, which established a reservation's boundaries, "shall continue in force." An Act making appropriations for the current and contingent expenses of the Indian Department and for fulfilling treaty stipulations with various Indian tribes, Ch. 543, 26 Stat. 989, 1042 (1891). Thus, while I agree that savings clauses may have a role in our statutory interpretation, see, e.g., City of New Town v. United States, 454 F.2d 121, 125 (8th Cir.1972), they should not have the talismanic significance proffered by the majority
 
 
 [32]
 The Treaty of 1858, between the United States and the Yankton Sioux Tribe, provided that:
 Article 1.
 The said chiefs and delegates of [the Yankton Sioux] tribe of Indians do hereby cede and relinquish to the United States all the lands now owned, possessed, or claimed by them, wherever situated, except four hundred thousand acres thereof, situated and described as follows, to wit--[describes boundaries of reservation].
 ....
 Article 4.
 In consideration of the foregoing cession, relinquishment, and agreements, the United States do hereby agree and stipulate as follows, to wit:
 1st. To protect the said Yanctons [sp] in the quiet and peaceable possession of the said tract of four hundred thousand acres of land so reserved for their future home, and also their persons and property thereon during good behavior on their part.
 2d. To pay to them, or expend for their benefit, the sum of sixty-five thousand dollars per annum, for ten years, commencing with the year in which they shall remove to, and settle and reside upon, their said reservation--forty thousand dollars per annum for and during ten years thereafter--twenty-five thousand dollars per annum for and during ten years thereafter--and fifteen thousand dollars per annum for and during twenty years thereafter--and fifteen thousand dollars per annum for and during twenty years thereafter; making one million and six hundred thousand dollars in annuities in the period of fifty years....
 Article 10.
 No white person, unless in the employment of the United States, or duly licensed to trade with the Yanctons, [sp] or members of the families of such persons, shall be permitted to reside or make any settlement upon any part of the tract herein reserved for said Indians, nor shall said Indians alienate, sell, or in any manner dispose of any portion thereof, except to the United States....
 (emphasis added).
 
 
 [33]
 The majority asserts that "to the extent there could be any ambiguity perceived in the [1894 Act], it would have to be resolved in favor of the tribe." Maj. Op. at 1448-49. In DeCoteau, the United States Supreme Court commented on the temptation to misuse this canon of construction that ambiguities are to be resolved in favor of the tribe:
 For the courts to reinstate the entire reservation, on the theory that retention of mere allotments was ill-advised, would carry us well beyond the rule by which legal ambiguities are resolved to the benefit of the Indians. We give this rule the broadest possible scope, but it remains at base a canon for construing the complex treaties, statutes, and contracts which define the status of Indian tribes. A canon of construction is not a license to disregard clear expressions of tribal and congressional intent.
 420 U.S. at 447, 95 S.Ct. at 1094 (emphasis added). The majority, therefore, may not use a canon of construction to create ambiguity where there is none, and there is no ambiguity in Articles I and II.
 
 
 [34]
 Apparently assuming that neither tribal members nor government negotiators kept abreast of significant legislation affecting Indian country, the majority dismisses Article XVII by asserting that "there is no evidence that any party was aware of [the 1892 liquor act] at the time the agreement was negotiated." Maj. Op. at 1450. I am sure that, if Congress had been aware that the plain language of its legislation was insufficient to convey its meaning to future courts, the legislative history in this case would have been much more complete
 
 
 [35]
 The majority asserts that this provision has "considerably less force" because the reserved sections were explicitly made " 'subject to the laws of the State of South Dakota.' " Maj. Op. at 1450 (quoting 1894 Act). I disagree, and find it somewhat illogical to infer a grant of jurisdiction to a tribe over ceded lands because of an explicit grant of jurisdiction to the State of South Dakota over the ceded lands
 
 
 [36]
 Even assuming that mere legislative history could rebut the almost insurmountable presumption of diminishment created by Articles I and II of the 1894 Act, there is nothing in the legislative history which contradicts the diminishment of the reservation. Although the district court referred to a letter in the legislative history which it believed to support the continued reservation status of the ceded lands, see Yankton Sioux, 890 F.Supp. at 883-86 (quoting S. Exec. Doc. No. 27 at 5), it is apparent that the district court made an erroneous interpretation. The letter relied on by the district court stated that " 'the treaty makes no provision regarding the cession or relinquishment of the reservation or any portion thereof.' " Id. at 883-84 (quoting S.Exec.Doc. 27 at 5). It is clear, and the parties agree, see Appellant's Motion to Enlarge Record at 1-2; Appellee's Response to Motion to Enlarge Record at 2, that this letter referred to the Treaty of 1858. The district court, however, misinterpreted this as a reference to the 1892 Agreement: "Most importantly, Armstrong also observed that the Agreement 'makes no provision regarding the cession or relinquishment of the reservation or any portion thereof.' " Yankton Sioux, 890 F.Supp. at 885-86 (emphasis deleted) (quoting S.Exec.Doc. No. 27 at 5). The only "Agreement" involved in this case, the 1892 Agreement, contained Article I, which expressly provided for the cession of a portion of the Yankton reservation. This fundamental error in the district court's interpretation of the legislative history of the 1894 Act substantially undermines its determination that the Yankton Sioux Reservation was not diminished
 
 
 [37]
 Treatment of the area by Congress and the Executive may also have some interpretive value. See Solem, 465 U.S. at 471, 104 S.Ct. at 1166-67. The United States Supreme Court has, however, typically held this evidence in low regard. In Hagen, the Court noted that "the views of a subsequent Congress form a hazardous basis of inferring the intent of an earlier one." 510 U.S. at 420, 114 S.Ct. at 970 (citation and quotations omitted). In Solem, the United States Supreme Court noted that:
 The subsequent treatment of the Cheyenne River Sioux Reservation by Congress, courts, and the Executive is so rife with contradictions and inconsistencies as to be of no help to either side.... [Ample] examples pointing in both directions leave one with the distinct impression that subsequent Congresses had no clear view whether the opened territories were or were not still part of the Cheyenne River Reservation. A similar state of confusion characterizes the Executive's treatment of the Cheyenne River Sioux Reservation's opened lands.
 465 U.S. at 478-79, 104 S.Ct. at 1170-71. See also Rosebud, 430 U.S. at 605 n. 27, 97 S.Ct. at 1372 n. 27 (the "sporadic, and often contradictory, history of congressional and administrative actions in other respects carries but little force"). The examples culled from the record by both the majority, see Maj. Op. at 1453-56, and the district court, see Yankton Sioux, 890 F.Supp. at 886-87, are similarly either "merely passing references," Hagen, 510 U.S. at 420, 114 S.Ct. at 970 (citations and quotations omitted), or "rife with contradictions." Solem, 465 U.S. at 478, 104 S.Ct. at 1170.
 
 
 [38]
 The majority dismisses the case law of the South Dakota Supreme Court by asserting that it does "not show full development of the issues or the analytical approach required by the United States Supreme Court." Maj. Op. at 1451. I disagree. In State v. Thompson, 355 N.W.2d 349 (S.D.1984), the South Dakota Supreme Court applied the analysis provided by the United States Supreme Court in DeCoteau and in Rosebud, and upheld its earlier determination that the Yankton Reservation had been diminished. See id. at 350-51. While the South Dakota Supreme Court's analysis in Thompson is considerably briefer than that performed by the majority in the instant case, I do not believe that accuracy can necessarily be measured by volume
 The majority also notes that the South Dakota Supreme Court was once reversed by the United States Supreme Court after incorrectly finding that a reservation had been diminished. See Maj. Op. at 1451 n. 20 (citing State v. Janis, 317 N.W.2d 133 (S.D.1982), abrogated in relevant part, Solem, 465 U.S. at 466, 104 S.Ct. at 1163-64 (affirming contrary decision in Bartlett v. Solem, 691 F.2d 420 (8th Cir.1982))). I remind the majority that, while we were right and the South Dakota Supreme Court was wrong in Solem, it was the South Dakota Supreme Court's finding of diminishment which was upheld, while this Court's conclusion that a reservation was not diminished was reversed, by the United States Supreme Court in DeCoteau. See 420 U.S. at 449, 95 S.Ct. at 1095 (affirming DeCoteau v. District County Court, 87 S.D. 555, 211 N.W.2d 843 (1973), and reversing United States ex rel. Feather v. Erickson, 489 F.2d 99 (8th Cir.1973)).
 
 
 [39]
 In addition, cases citing to Perrin have assumed that the Yankton reservation had been diminished. See, e.g., United States v. Mazurie, 419 U.S. 544, 554, 95 S.Ct. 710, 716, 42 L.Ed.2d 706 (1975) (Perrin involved land that "originally had been included in the Yankton Sioux Indian Reservation, but had been ceded to the United States."); Mescalero Apache Tribe v. Jones, 411 U.S. 145, 159, 93 S.Ct. 1267, 1276, 36 L.Ed.2d 114 (1973) (Douglas, J., dissenting) ("In the liquor cases the Court held that it reached acts even off Indian reservations in areas normally subject to the police power of the States." (citing to Perrin )); Johnson v. Gearlds, 234 U.S. 422, 444-45, 34 S.Ct. 794, 802, 58 L.Ed. 1383 (1914) (Perrin involved "ceded lands formerly included in the Yankton Sioux Indian reservation in the State of South Dakota.")